JUDGE FURMAN

# 12 CIV 4027

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Gregory Scrydoff, Individually and On Behalf Of All Others Similarly Situated, )<br><br>Plaintiff, )<br>vs. )<br><br>JPMORGAN CHASE & COMPANY, THE )<br>JMORGAN CHASE RETIREMENT )<br>PLAN, JPMORGAN CHASE BANK, N.A., )<br>JPMORGAN COMPENSATION 7 )<br>MANAGEMENT DEVELOPMENT )<br>COMMITTEE, BERNADETTE J. ULISSI, )<br>DAVID C. NOVAK, STEPHEN B. )<br>BURKE, )<br>LEE R. RAYMOND, WILLIAM )<br>WELDON, JOHN DOES 1-10, JAMES )<br>DIMON, INA R. DREW, DOUGLAS L. )<br>BRAUNSTEIN, JOHN DOES 1-100, )<br><br>Defendants. )<br> | **CIVIL ACTION NO.**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR BREACH OF ERISA'S FIDUCIARY DUTIES**<br><br>**JURY TRIAL DEMANDED** |

RECEIVED
MAY 21 2012
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Gregory Scrydolff, individually and on behalf of a class similarly situated participants in and beneficiaries of JPMorgan Chase & Company's Retirement Plan, which includes but is not limited to 401(k) Savings Plans, Deferred Compensation Program ("DCP") and the JPMorgan Retirement Plan (each a "Plan" and collectively, the "Plans"), allege the following based upon the investigation of Plaintiff's counsel, which included a review of United State Securities and Exchange Commission ("SEC") filings by JPMorgan Chase & Co. ("JPMorgan" or the "Company"), as well as regulatory filings and reports and advisories about the Company, press releases and other public statements issued by the Company, and media

reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      Plaintiff brings this civil enforcement action under Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, for Plan-wide relief on behalf of the Plans, and, to the extent deemed necessary or appropriate by the Court, on behalf of a class consisting of all current and former participants in the Plans,  a defined benefit plan sponsored by JPMorgan Chase Bank, N.A. for eligible employees of JPMorgan and participating affiliate companies  (and the beneficiaries of such participants) for whose individual accounts the Plans held JPMorgan common stock at any time between April 12, 2012 and including the present (the "Class Period").  Plaintiff brings this action pursuant to §§ 502(a)(2) and (a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (a)(3).

2.      As more fully set forth below, Defendants breached their fiduciary duties to the Participants, including the fiduciary duties of prudence and loyalty set forth in ERISA § 404(a), 20 U.S.C. § 1104(a).  During the Class Period, the Plans' fiduciaries, JPMorgan and certain of its senior officers and directors, breached their fiduciary duties owed to the Plan's participants and beneficiaries (collectively, the "Participants"), by (i) failing to manage and administer the Plans' assets with the care, skill, prudence, and diligence of a prudent person under the circumstances; (ii) investing Plans assets in JPMorgan common stock when JPMorgan common stock was an imprudent investment option retirement savings; (iii) failing to inform Participants about the true risk and return characteristics of JPMorgan common stock and the suitability of JPMorgan common stock as a retirement savings investment; (iv) failing to disclose to Participants material information concerning JPMorgan and JPMorgan common stock, information which was

necessary to allow Participants to make informed judgments concerning their retirement savings; and (v) permitting the Participants to invest their retirement savings in JPMorgan common stock when the price of JPMorgan common stock was substantially artificially inflated during the Class Period.

3.      As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plans the losses resulting from each such breach of fiduciary duty.   In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks appropriate equitable relief including, without limitation, the equitable remedy of surcharge, restitution, monetary relief and lost profits (lost profits as calculated on both an individual Participant account basis and on a Plan-wide basis).

4.      JPMorgan is a financial services company that provides various investment management products and services worldwide to assist corporations, financial institutions, and individuals in managing and servicing their financial assets.

5.      Plaintiff was a JPMorgan employee and participant in the Companies' Plans during the Class Period. As described further herein, as a Plan Participant, Plaintiff, like other members of the Class, voluntarily agreed to have part of his compensation withheld by the JPMorgan for the Company to invest, on Plaintiff's behalf, in various investment options provided by the Plans. Among the investment options in the Plans was JPMorgan common stock. Plaintiff's investment portfolio in the Plans during the Class Period included JPMorgan stock.

6.      401(k) employee saving plans and deferred compensation plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) or a deferred compensation plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his

or her retirement investment portfolio. Common stock of JPMorgan was held by each of the Plans throughout the Class Period. Throughout the Class Period, the Plans invested heavily in JPMorgan common stock. Because the Plan's holdings in JPMorgan common stock comprised a significant percentage of the overall value of the Plan's investments held on behalf of the Participants, the long-term retirement savings of Participants were dependent, to a substantial degree, on the performance of JPMorgan common stock. So too were Participants' retirement fortunes dependent on the related need for prudent fiduciary decisions by Defendants, concerning such a large, ongoing investment of the Plans' assets.

7.     JPMorgan is a financial services company that provides various investment management products and services worldwide to assist corporations, financial institutions, and individuals in managing and servicing their financial assets.

8.     Throughout the Class Period, JPMorgan made a series of false and misleading statements and omissions regarding, among other things, the financial health of the Company.

9.     This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are liable pursuant to ERISA § 502 and 29 U.S.C. § 1132. Because Plaintiff's claims apply to the Plans, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plans for breaches of fiduciary duty such as those alleged herein, Plaintiff beings this as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

4

11.     Venue is proper in this district pursuant to ERISA § 501(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district .

12.     More specifically, this district is an appropriate venue for this action because on recent Plan Form 5500 annual filings, the address listed for Defendant JPMorgan Chase Bank, N.A., the sponsor of the Plans, is in this district.   Further, the principal executive offices of Defendant JPMorgan, the sponsor and administrator of the Plans, are located in this district. Additionally, it is likely that many of the parties and potential witnesses, including the Plans' administrative committee members, corporate executives and many plan participants, are located in or within close proximity to this district.

**PARTIES**

13.     Plaintiff Gregory Scrydloff is a plan "participant," within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), was employed with Chase Investment Services Corp., a subsidiary of Defendant JPMorgan and held JPMorgan shares in his account during the Class Period. Among other valuable options under the Plans, Plaintiff selected the JPMorgan stock for his retirement account.

**Corporate Defendants**

14.     Defendant The JP Morgan Chase Retirement Plan/401K Savings Plan is an employee pension benefit plan under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).   Specifically, the Plans are a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35). The Plans are noncontributory defined benefit plan.   The Plans generally include all active, full

and part time salaried, U.S. Dollar paid employees of JPMorgan and certain affiliated companies, who have completed at least one year of service.

15. Defendant JPMorgan Chase Bank, N.A. ("JPMC Bank") is a national banking association, headquartered in New York, NY. Defendant JPMC Bank is a wholly-owned subsidiary of Defendant JPMorgan Chase, a financial holding company incorporated in Delaware.

16. According to the Plans' Form 5500 submission to the IRS and Department of Labor for 2010 ("Form 5500"), Defendant JPMC Bank is the Plans' sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B) and the Plans' administrator pursuant to ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). Defendant JPMC Bank is a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that it has discretionary authority and control regarding the administration and management of the Plans and/or the Plans' assets.

17. Defendant JPMorgan is a Delaware corporation headquartered in New York, NY and is the parent company of Defendant JPMC Bank. JPMorgan is a financial holding company, which provides various financial services worldwide and trades on the NYSE under the ticker "JPM." JPMorgan's principal executive offices are in New York, New York. Upon information and belief, Defendant JPMC is a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. §(21)(A) in that it has discretionary authority and control regarding the administration and management of the Plans and/or the Plans' assets.

**The Committee and Committee Defendants**

18. Defendant Compensation & Management Development Committee (the "Committee") served, upon information and belief, as a "named fiduciary" of the Plans during

the Class Period.  The Committee, upon information and belief, has the power and authority to interpret and administer the Plans and to appoint individuals to assist with Plans' administration.

19.    Defendant Bernadette J. Ulissi ("Ulissi") signed JPMorgan's Form 5500 as the individual signing as the plan administrator.    Ulissi was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercise discretionary authority or control over the Plans' management and/or authority or control over management or disposition of Plan assets.

20.    Defendant David C. Novak ("Novak") served as a member of the Committee during the Class Period.  Novak was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plans' management and/or authority or control over management or disposition of Plan assets.

21.    Defendant Stephen B. Burke ("Burke") served as a member of the Committee during the Class Period.  Burke was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plans' management and/or authority or control over management or disposition of Plan assets.

22.    Defendant Lee R. Raymond ("Raymond") served as a member of the Committee during the Class Period.  Raymond was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plans' management and/or authority or control over management or disposition of Plan assets

23.    Defendant William C. Weldon was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plans' management and/or authority or control over management or disposition of Plan assets.

24.     Defendant John Does 1-10 consist of the remaining members of the Committee. Because Plaintiff is currently unaware of the true identities and capacities of the remaining members of the Committee, those individuals are named as John Does 1-10.  The remaining members of the Committee, whose real names will be substituted when they are known to Plaintiffs, exercised discretionary authority and discretionary control with respect to the management of the Plans and their assets.

25.     Defendants Ulissi, Burke, Novak, Raymond, Weldon and John Does 1-10 are collectively referenced herein as the "Committee Defendants."

**The Officers, Directors & "Individual Defendants**

26.     Defendant James Dimon ("Dimon") serves as JPMorgan's Chairman, Chief Executive Officer, President, Member of the Executive Committee, Member of the Stock Committee and Member of the Operating Committee at all times applicable hereto.

27.     Defendant Ina R. Drew ('Drew") served as JPMorgan's Chief Investment Officer and Member of the Operating Committee at all times relevant hereto.

28.     Defendant Douglas L. Braunstein ("Braunstein") serves as JPMorgan's Executive Vice President and Chief Financial Officer.

29.     Defendants Dimon, Drew and Braunstein are collectively referred to herein as the "Individual Defendants."

30.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of JPMorgan, were privy to confidential and proprietary information concerning JPMorgan, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning JPMorgan, as discussed in detail below.  Because of their positions with JPMorgan,

the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of director meeting and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

31.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power to influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of JPMorgan business.

32.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

33.     As senior executive officers and/or directors and as controlling persons of a publically traded company whose common stock was, and is, registered with the SEC pursuant to

the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to JPMorgan's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct and previously issued statements that had become materially misleading or untrue, so that the market price of JPMorgan common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

34. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as fraud or deceit on purchasers of JPMorgan common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding JPMorgan's business, operations and management and the intrinsic value of JPMorgan common stock; and (ii) caused Plaintiff and members of the Class to purchase JPMorgan common stock at artificially inflated prices.

35. Unknown "John Doe" Defendants 1-100 are residents to the United States and are or were fiduciaries of the Plain during the Class Period, including, without limitation, directors, officers, and Plan administrative committee members. Their identities are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

36. Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(1) and/or (b)(2) on behalf of himself and the following class of persons similarly situated (the "Class"):

> All individuals, excluding Defendants, who have participated in the Plans, including the JPMorgan Chase Retirement Plan, 401K Savings Plan, or a predecessor plan, including without limitation, cash balance plans, at any time on or after April 12, 2012 through the present date (the "Class Period") whose accrued pension benefits are based, in whole or in part, on such plan's cash balance formula, and their beneficiaries.

37.     Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, JPMorgan common stick was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery.  Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by JPMorgan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     a.   Whether Defendants each owed a fiduciary duty to the Plans, Plaintiff and members of the Class;

     b.   Whether Defendants breached their fiduciary duties to the Plans, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and beneficiaries;

     c.   Whether the Defendants violated ERISA; and

     d.   To what extent the members of the Class have sustained damages and the proper measure of damages.

42.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages and/or were negatively affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA employee pension plans.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impeded their ability to protect their interests.

45.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standard of conduct for Defendants and/or (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

## FIDUCIARY DUTIES UNDER ERISA

**The Statutory Requirements:**

46.     ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

**The Duty of Loyalty:**

47.     ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .  providing benefits to participants and their beneficiaries . . . ."

48.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye

single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

**The Duty of Prudence:**

49.    Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . ."

**The Duty to Inform:**

50.    The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

51.    Pursuant to the duty to inform, fiduciaries of the Plans were required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires that fiduciaries furnish a Summary Plan Description ("SPD") to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise Participants of their rights under the Plan. The SPD and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plans and in making

14

decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

**The Duty to Investigate and Monitor Investment Alternatives:**

52.     With respect to a pension plan such as the Plans, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plans, including employer securities, to ensure that each investment is a suitable option for the Plans.

**The Duty to Monitor Appointed Fiduciaries:**

53.     Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.  In the Plans, the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a) possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

(b) are knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of Plans' Participants;

(c) are provided with adequate financial resources to do their jobs;

(d) have adequate information to do their jobs of overseeing the Plans' investments with respect to company stock;

(e) have access to outside, impartial advisors when needed;

(f) maintain adequate records of the information on which they base their decisions and analysis with respect to Plans' investment options; and

(g) report regularly to the monitoring fiduciaries.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

**The Duty Sometimes to Disregard Plan Documents**:

54.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

**Co-Fiduciary Liability**:

55.    A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**Non-Fiduciary Liability**:

56.     Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## JPMorgan's Fiduciary Status

57.     Instead of delegating fiduciary responsibility for the Plans to external service providers, the Company chose to internalize certain vital aspects of this fiduciary function.

58.     During the Class Period, JPMorgan was also a fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because, JPMorgan through its officers, directors or otherwise, exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plans' assets, and is therefore a fiduciary of the Plans. JPMorgan also exercised discretionary authority with respect to the appointment, removal, and, thus, monitoring of other fiduciaries of the Plans that it appointed, or to whom it assigned fiduciary responsibility.

59.     By failing to properly discharge their fiduciary duties under ERISA, the employee and officer defendants, including the Committee Defendants, breached fiduciary duties they owed to the Plans, their participants and their beneficiaries. Such individuals were appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their

employment. Accordingly, the actions of such employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

60.     In addition, JPMorgan acted as a fiduciary in connection with the dissemination of communications to the Plans' Participants. JPMorgan made direct representations to Participants relating specifically to the business and financial condition of JPMorgan, and the merits of investing the Plan's assets in JPMorgan common stock, and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plans.

**The Committee's Fiduciary Status**

61.     The Committee is comprised of persons appointed by the Board and delegated the day-to-day responsibility for the administration of the Plans. The Committee and its members were fiduciaries of the Plans, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they were, upon information and belief, named fiduciaries of the Plans and exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

62.     Upon information and belief, the Committee is a "named fiduciary" of the Plans and has full discretionary power and authority to construe, interpret and administer the Plans, including questions concerning eligibility and payment of benefits and may adopt rules and regulations for administering the Plans.

63.     Defendant Ulissi and the other Committee Defendants were fiduciaries of the Plans because they made statements to the Plans' Participants and they exercised discretionary authority with respect to: (i) managing and administering the Plans; and/or (ii) managing and disposing of the Plans' assets.

64.     Ulissi is also a fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(2l)(A), in that Ulissi signed JPMorgan's Form 5500 as the individual signing as the Plans' sponsor and the Plans' administrator.

## Additional Fiduciary Aspects of Defendants' Actions/Inactions

65.     ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plans and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *see also In re Unisys Corp. Retiree Medical Benefit ERISA Litig.,* 57 F.3d 1255, 1261 (3d Cir. 1995); *Fisher v. Philadelphia Elec. Co.,* 994 F.2d 130, 133 (3d Cir. 1993).

66.     Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured. *See, e.g., In re Unisys Corp., supra,* 994 F.2d at 133 ("a plan administrator has an affirmative duty to speak when it knows that silence might be harmful."); *see also Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993); *James v. Pirelli Armstrong Tire Corp.,* 305 F.3d 439, 449 (6th Cir. 2002); *Matthews v. Chevron Corp.,* 362 F.3d 1172, 1180 (9th Cir. 2004).

67.     During the Class Period, upon information and belief, the Company and certain other Defendants made direct and indirect communications with the Plans' participants including statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plans documents (including Summary Plans Descriptions ("SPDs") and/or prospectuses regarding Plans/participant

holdings of Company stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, JPMorgan's SEC filings were incorporated into and part of the SPDs, and/or a prospectus and/or any applicable SEC Form S-8 registration statements. Defendants also acted as fiduciaries to the extent of this activity.

**All of the Defendants Were Co-Fiduciaries**

68.     Each defendant is liable for the breaches of fiduciary duty of the other defendants under ERISA § 405, 29 U.S.C. § 1105

## FACTUAL ALLEGATIONS

69.     On April 6, 2012, *Bloomberg* issued a report entitled JPMorgan Trader's Positions Said to Distort Credit Indexes. According to the report, "[a] JPMorgan Chase & Co. trader of derivatives linked to the financial health of corporations has amassed positions so large that he's driving price moves in the $10 trillion market."

70.     The Class Period begins on April 13, 2012. On that date, JPMorgan issued an earnings release for the first quarter of 2012, the period ending March 31, 2012. The supplement to the earnings release included information about the positions of the Chief Investment Office ("CIO"). The reported "Quarterly Trends" for the Treasury and CIO investment securities were small and positive: JPMorgan reported that the average value of the Treasury and CIO investment securities portfolio had increased 3% since the previous quarter. JPMorgan also reported that the CIO's value-at-risk ("VaR"), which it defines as a "measure of the dollar amount of potential loss from adverse market moves in an ordinary market environment," had declined from $69 million in the fourth quarter of 2011 to $67 million in the first quarter of 2012.

71.     JPMorgan's VaR is an important measure of the risk of its positions. The $67 million number represented the maximum likely loss on the CIO's positions. Specifically, by

stating that the CIO's VaR was $67 million, JPMorgan was representing that in 95% of likely scenarios, the maximum amount the CIO's positions would lose was $67 million.  JPMorgan emphasized in its earnings release supplement that the CIO's positions were used for risk management to reduce the risk of other positions JPMorgan held outside of the CIO, stating that "CIO VaR includes positions, primarily in debt securities and credit products, used to manage structural risk and other risks, including interest rate, credit and mortgage risk arising from the Firm's ongoing business activities."

72.     On April 13, 2012, JPMorgan also held a conference call with analysts and investors to discuss its earnings for the first quarter of 2012 ("First Quarter Conf. Call").  During the First Quarter Conference Call, Defendants made numerous statements about the Company's CIO.  In his opening remarks, Defendant Braunstein, stated, in pertinent part, as follows:

> And so before I turn it over to Jamie, I did want to talk about the topics in the news around CIO and just sort of take a step back and remind our investors about that activity and performance.  We have more liabilities, $1.1 trillion of deposits than we have loans, approximately $720 billion.  And we take that differential and we invest it, and that portfolio today is approximately $360 billion. We invest those securities in high grade, low-risk securities.  We have got about $175 billion worth of mortgage securities, we have got government agencies securities, high-grade credit and covered bonds, securitized products, municipals, marketable CDs.  The vast majority of those are government or government-backed and very high grade in nature.  We invest those in order to hedge the interest rate risk of the Firm as a function of that liability and asset mismatch.  We hedge basis risk, we hedge convexity risk, foreign exchange risk is managed through CIO, and MSR rick.  We also do it to generate NII, which we do with that portfolio. The result of all that is we also need to manage the stress loss associated with that portfolio, and so we have put on positions to manage for a significant stress event in Credit.  We have had that position on for many years and the activities that have been reported in the paper are basically part of managing that stress loss position, which we moderate and change over time depending upon our views as to what the risks are for stress loss from credit.

All of those decisions are made on a very long-term basis. They are done to keep the Company effectively balanced from a risk standpoint. We are very comfortable with our positions as they are held today. And I would add that all those positions are fully transparent to the regulators. They review them, have access to them at any point in time, get the information on those positions on a regular and recurring basis as part of our normalized reporting. All of those positions are put on pursuant to the risk management at the Firmwide level.

The last comment that I would make is that based on, we believe, the spirit of the legislation as well as our reading of the legislation and consistent with this long-term investment philosophy we have in CIO we believe all of this is consistent with what we believe the ultimate outcome will be related to Volcker.

73.    During the first Quarter Conference Call, Defendant Dimon was asked directly about the trading activities of CIO and dismissed any concerns. The following exchange took place:

**Guy Moszkowski – BofA Merrill Lynch Analyst** – Good Morning. On the CIO question, which obviously you have addressed and has gotten so much attention in the press this week, can I just ask one further question, which is, are all of the results of the CIO group reflected only within Corporate and Other? There is no sharing of any of those results with, say, FICC in terms of the reporting that we would see in the Investment Bank?

**Jamie Dimon – JPMorgan Chase & Company – Chairman & CEO** – No, God, no. No, no. A lot of the NII is given to the businesses that generate the deposits on a consistent fund transfer methodology, which – but not in the Investment Bank. Remember, most of that portfolio is an AFS portfolio, not all of it, but most of it.

**Guy Moszkowski – BofA Merrill Lynch – Analyst** – Right, fair enough. It's just I (multiple speakers)

**Jamie Dimon – JPMorgan Chase & Company – Chairman & CEO** – We disclosed both realized gains, unrealized gains, and market-to-market gains. You get all of that.

**Guy Moszkowski – BofA Merrill Lynch – Analyst** – Yes, that is just a question that I ask in order to sort of assess the tempest in the

teapot nature of the stories relative to the revenues that we see that just don't seem to be that big.

**Jamie Dimon – JPMorgan Chase & Company – Chairman & CEO –** *It's a complete tempest in a teapot. Every bank has a major portfolio; in those portfolios you make investments that you think are wise to offset your exposures.*

Obviously, it's a big portfolio; we are a large company and we try to run it – it's sophisticated obviously with complex things. But at the end of the day that is our job is to invest that portfolio wisely, intelligently over a long period of time to earn income and to offset other exposures that we have.

[Emphasis added.]

74.    The statements referenced above in ¶¶70-73 were each materially false and misleading when made because they failed to disclose that the Company had engaged in extremely risky speculative trades that generated enormous losses for the Company.

75.    Then, on May 10, 2012, JPMorgan filed its Form 10-Q for the quarter ended March 31, 2012, with the SEC. After the market closed, JPMorgan held a conference call with analysts and investors to discuss the Form 10-Q. Defendant Dimon opened the conference call by revealing that the Company had sustained a multi-billion dollar trading loss, stating, in pertinent part, as follows:

Operator, thank you. Good afternoon everybody. I would like to thank you all for joining us on short notice. I want to update you on a few items that we have in our just filed 10-Q. Specifically, we've given prior guidance that Corporate – that net income in the Corporate segment, remember it's not the corporation, it's just one of the segments, excl.-Private Equity and litigation, would be approximately plus or minus $200 million. This includes CIO's overall performance.

We would currently estimate this number to be minus $800 million after-tax. This change is due to two items, both in CIO this quarter. I'm about to give you pretax numbers now. **Slightly more than $2 billion trading loss under synthetic credit positions and $1 billion of securities gains, largely on the sale of credit exposures. I want to remind you the CIO has over $200 billion**

23

**in its investment portfolio and unrealized gains as of march 30 of $8 billion.**

The CIO manages all the exposures in total as a whole and it does it in light of the firm's total requirements. We are also amending a disclosure in the first quarter press release about how CIO's VaR, Value at Risk. We had shown average VaR at 67. It will now be 129. In the first quarter, we implemented a new VaR model, which we now deemed inadequate and we went back to the old one, which had been used for the prior several years, which we deemed to be more adequate. The numbers I just gave are effective March 30, the first quarter.

Regarding what happened, the synthetic credit portfolio was a strategy to hedge the firm's overall credit exposure, which is our largest risk overall in a stressed credit environment. We are reducing that hedge, but in hindsight the new strategy was flawed, complex, poorly reviewed, poorly executed, and poorly monitored. The portfolio has proven to be riskier, more volatile, and less effective as an economic hedge than we thought.

What have we done? We've had teams from audit, legal, risk, and various control functions, all from Corporate, involved in extensive review of what happened. We have more work to do but it's obvious at this point that there are many errors, sloppiness, and bad judgment. I do remind you that none of this has anything to do with clients. We've had many lessons learned and we've already changed some policies and procedures as we've gone along. In addition, you should know that all appropriate corrective action will be taken as necessary in the future. Most important, some of our best talent from across the Company, particularly traders and risk managers, are fully engaged and helping to manage the portfolio.

The portfolio still has a lot of risk and volatility going forward. So how are we going to manage that? So number one, we're going to manage it to maximize economic value for shareholders. What does that mean? It means we're going to do something stupid. We're willing to hold as long as necessary inventory and we're willing to bear volatility. Therefore, the volatility for the rest of this quarter and next quarter or so will be high. It could cost us as much as $1 billion or more. Obviously, we're going to work hard to have that not be a negative at all, but it is risky and it will be for a couple of quarters.

Clearly, markets and our decisions will be a critical factor here. Hopefully this will not be an issue by the end of the year, but it does depend on the decisions and the markets – the decisions we make and the markets we have.

However unfortunate this even it, I do want to put this in perspective. One of the reasons we keep a fortress balance sheet is to handle surprises, although this is not the kind of support we wanted to have. Our Basel I ratio will stay very strong and it doesn't change at all as a result of – at March 31, a result of this. Our Basel III ratios, which remember, are a rough estimate anyway, will be amended down to 8.2 from 8.4 effective March 30. We will, however, in the future, continue to meet our very conservative targets for both Basel I and Basel III.

I also want to say, while we don't give overall earnings guidance and we're not confirming analyst estimates, if you did adjust current analyst estimates for the loss, we would still earn approximately $4 billion after-tax this quarter, give or take. Neither of these things absolves us from blame, so speaking for the senior management team and myself, while we can't assure you we won't make mistakes, we can assure you we're going to try not to. These were egregious mistakes. They were self-inflicted, we were accountable, and what happened violates our own standards and principles by how we want to operate the Company. This is not how we want to run a business.

We will discuss all these matters and more and in fulsome detail on our second quarter analyst call, and we're going to take some questions on this call. I do want to tell you now we're not going to take questions about specific risk positions, strategies, or specific people.

Finally, however unfortunate this incident is, we will do what we always do. We will admit it. We will learn from it. We will fix it. We will move on. Hopefully, in the end it will make us a better company. We are in business to serve clients and nothing here detracts from all the great things that our 250,000 employees around the world do every day for our clients and communities. So thank you for spending a little time with us today and we'll be happy to take a few minutes of questions.

[Emphasis added.]

76.    In response to the disclosure of the massive trading loss, the price of JPMorgan

stock declined from $40.74 per share to $36.96 per share on extremely heavy trading volume.

77.     The market for JPMorgan common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, JPMorgan common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchase or otherwise acquired JPMorgan common stick relying upon the integrity of the market price of JPMorgan common stock and market information relating to JPMorgan, and have been damaged thereby.

78.     During the Class Period, Defendants materially mislead the investing public, thereby inflating the price of JPMorgan common stock, by publically issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

79.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period Defendants made or caused to be made a series of materially false or misleading statements about JPMorgan's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of JPMorgan and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

80.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding JPMorgan, their control over, and/or receipt and/or modification of JPMorgan's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

81.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of JPMorgan common stock and operated as a fraud or deceit on Class Period purchasers of JPMorgan common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and become apparent to the market, the price of JPMorgan common stock fell precipitously as the prior artificial inflation came out.

82.     As a result of their purchases of JPMorgan common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e. damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused JPMorgan common stock to trade at artificially inflated levels throughout the Class Period.

## CLAIMS FOR RELIEF UNDER ERISA

83. At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

84. ERISA § 502(a)(2), 29 U.S.C. §1 132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

85. ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

86. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

87. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982). They entail, among other things:

> a. The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.  A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

c.  A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

88.  ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co- fiduciary," provides, in pertinent part, that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1 104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

89.  Plaintiffs therefore brings this action under the authority of ERISA §502(a) for Plans-wide relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

90.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein,

91.     At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

92.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans. Defendants are liable for losses incurred as a result of such investments being imprudent.

93.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plans documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

94.     Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plans or their assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. This duty to inform participants includes an obligation to provide participants and beneficiaries

of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plans' investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made under the Plans.

95.     Defendants breached their duties to prudently and loyally manage the Plans' assets.  During the Class Period these Defendants knew or should have known that, throughout the Class Period, JPMorgan materially mislead the investing public, thereby inflating the price of JPMorgan common stock, by publically issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements as set forth herein, not false and misleading.

96.     Defendants further breached their duties of loyalty and prudence by failing to divest the Plans of JPMorgan stock when they knew or should have known that it was not suitable and appropriate for the Plans' investment.

97.     Defendants breached their duties of loyalty and prudence by failing to ensure that participants liquidated their JPMorgan common stock investments in each of the Plans and transferred the dale proceeds to the other investment options available in the Company.  With actual or constructive knowledge that the Plans' participants did not have full and complete information about the Company's scheme to defraud investors, and thus were unable to make fully informed decisions about whether to retain their holdings in Company stock, Defendants had the fiduciary obligation to either inform the Plans' participants of the need to take action to protect their financial interests or, if necessary, to liquidate holdings of Company stock on participants' behalf to ensure that they did not suffer a financial loss.

98.     Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same.  As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's stock and therefore, could not make informed decisions regarding their investments in the Plans.

99.     Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.  Defendants had or should have had knowledge of such breaches by other Plans fiduciaries, yet made no effort to remedy them.

100.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.  Had Defendants taken the appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plans.

101.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)

102.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

103.    At all relevant times, as alleged above, Defendants were fiduciaries within the Plans within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

104.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1 104(a)(1)(A), imposes on Plans fiduciaries a duty of loyalty, that is, a duty to discharge his duties with respect to a Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

105.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:

> (a)    Failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities;

> (b)    Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

> (c)    By otherwise placing the interests of JPMorgan and themselves above the interests of the Participants with respect to the Plans' investment in JPMorgan Stock, by among other things, keeping the Plans' assets heavily invested in JPMorgan common stock when it was imprudent to do so - rather than divesting the Plans' investments in JPMorgan common stock - while certain fiduciaries sold their personally held JPMorgan common stock at artificially inflated prices. As a result, certain fiduciaries personally profited from those sales while the Plans and their Participants suffered massive losses.

106.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses. If Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

107.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404 by JPMorgan, the Committee and the Committee Defendants)

108.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

109.    At all relevant times, as alleged above, JPMorgan, the Committee and the Committee Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

110.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of JPMorgan, the Committee and the Committee Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Committee and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

111.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, JPMorgan, the Committee and the Committee Defendants, had the duty to:

a. Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about

the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

b. Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

c. Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

d. Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

e. Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investments; and

f. Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries. The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

112. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

113. JPMorgan, the Committee and the Committee Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the Committee completely appreciated the huge risk of significant investment of the retirement savings of rank

and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation; (b) failing to disclose to the Committee accurate information about the operations and financial results of JPMorgan which Defendants reasonably should have known the Committee needed to make sufficiently informed decisions about construing, interpreting, and administering the Plans; (c) failing to ensure that the members of the Committee were prudently and loyally managing and administering the Plans; and (d) to the extent it was necessary, failing to remove and replace members of the Committee for their failure to prudently and loyally manage and administer the Plans.  JPMorgan and the Committee Defendants knew or should have known that the fiduciaries they were responsible for monitoring were continuing to invest the assets of the Plans in JPMorgan common stock when it no longer was prudent to do so. Despite this knowledge, JPMorgan, the Committee and the Committee Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

114.    In addition, JPMorgan and the Committee Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of JPMorgan that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

115.    JPMorgan and the Committee Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

116.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

117.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Fiduciary Duty to Provide
### Complete and Accurate Information ERISA
### § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B)

118.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

119.    The fiduciary duties of loyalty and prudence also entail a duty to provide complete and accurate information concerning the Plans' investment options, including the financial performance of JPMorgan, to plan participants and beneficiaries.  This duty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding plan investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans.  This duty applies to all plan investment options, including investment in JPMorgan Stock.

120.    The Defendants breached their duty to provide truthful and accurate information

to plan participants and beneficiaries by failing to provide complete and accurate information regarding JPMorgan stock by (i) failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities; (ii) failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served; and (iii) by otherwise placing the interests of JPMorgan and themselves above the interests of the Participants with respect to the Plans' investment in JPMorgan Stock, by among other things, keeping the Plans' assets heavily invested in JPMorgan common stock when it was imprudent to do so - rather than divesting the Plans' investments in JPMorgan common stock - while certain fiduciaries sold their personally held JPMorgan common stock at artificially inflated prices. As a result, certain fiduciaries personally profited from those sales while the Plans and their Participants suffered massive losses.

121.    During the Class Period, Defendants' fiduciary duties bound them to ensure that communications by and about the Plans and their assets were truthful, complete, and not misleading, including information concerning the investment options offered under the Plans.

122.    Upon information and belief, Defendants conveyed false and misleading material information to the investing public and to the Plaintiff and the Class, regarding the soundness of JPMorgan stock and the prudence of investing retirement savings in JPMorgan stock. Because large percentages of the Plans' assets were invested in JPMorgan stock during the Class Period, losses therefrom materially affected the value of Participants' retirement assets.

123.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the

participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above described statements, acts, and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in JPMorgan Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested plan assets in JPMorgan Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

124.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of its retirement investments.

125.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.


## COUNT V

### Co-Fiduciary Liability
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against the Committee Defendants)

126.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

127.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly

in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1 104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

128.     As alleged herein, JPMorgan, through its officers and employees, such as the Committee Defendants failed to provide material information to the Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices to the detriment of Plaintiff and members of the Class, and, thus, knowledge of such practices is imputed to these defendants as a matter of law. In addition, as alleged herein on information and belief, JPMorgan and the other defendants named in this Count participated in and/or knew about JPMorgan's scheme to defraud standing instruction investors. Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of JPMorgan stock as an investment for the Participants' retirement assets.

129.     Despite this knowledge, the Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plans' investment and holding of JPMorgan stock during the Class Period. Defendants did so by themselves making imprudent and disloyal decisions respecting the Plans' investment in JPMorgan stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A). In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plans' investment in JPMorgan stock despite knowing such failures were breaches of fiduciary duty under ERISA.  Instead, they allowed the

harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405 (a)(l)(C).

130.    In further violation of ERISA § 405(a)(1)(C), the Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole. Instead, they compounded the problem by further concealing JPMorgan's improper practices from Participants and the market as a whole.

131.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants, lost a significant portion of their retirement investment and Plan Participants materially overpaid for their JPMorgan shares.

132.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

133.    The Plans suffered tens of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties, reflected in the diminished account balances of the Plan's participants, significant reputational damages and lost business, high litigation costs, JPMorgan likely disgorgement, and probable civil and criminal penalties, and threatens the Company's future revenue.

134.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses that they suffered through the Plans' continued investment in Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

135.    As noted above, as a consequence of Defendants' breaches, the Plans suffered significant losses.

136.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plans any losses to the plans . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

137.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been had the plan been properly administered.

138.    Plaintiff, the Plans, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as

provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

139.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for:

A.    A Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiff as class representative, and determining that Plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.    A Declaration that Defendants breached ERISA fiduciary duties owed to the Plans and Participants;

C.    A Declaration that Defendants are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.    An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits Defendants made through use of the

Plans' assets, and to restore to the Plans all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

E.   Imposition a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

F.   An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

G.   Actual damages in the amount of any losses the Plans suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

H.   An Order that Defendants allocate the Plans' recoveries to the accounts of all Participants who had any portion of their account balances invested in JPMorgan common stock maintained by the Plans in proportion to the accounts' losses attributable to the decline in the price of JPMorgan common stock;

I.   Awarding the Plans and/or Participants rescission and/or money damages (including pre-judgment interest) pursuant to the Securities Act;

J.   An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

K.   An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.   An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

M.   Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: New York, NY
      May 21, 2012

**BROWER PIVEN**
A Professional Corporation

By: _____
Daniel I. Wolf
Brian C. Kerr
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

**GILMAN LAW LLP**
Kenneth G. Gilman, Esq.
Florida Bar No.: 0340758
Thomas E. N. Shea, Esq.
Florida Bar No.: 0084676
Beachway Professional Center Tower
3301 Bonita Beach Road, Suite 307
Bonita Springs, Florida 34134
(239) 221-8301 (telephone)
(239) 676-8224 (facsimile)
kgilman@gilmanpastor.com
tshea@gilmanpastor.com

*Attorneys for Plaintiff and Proposed Class*