IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re JPMorgan Chase & Co. ERISA Litigation | Case No. 1:12-cv-04027-GBD |
| | ECF Case |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs, Matt L. Ward and Mary Loeza, individually and on behalf of the class of other similarly situated employees and former employees who were participants in and beneficiaries of the JPMorgan Chase 401(k) Savings Plan (the "Plan"), allege the following based upon the investigation of counsel, which included a review of available documents governing the operations of the Plan; a review of Internal Revenue Service Form 5500s ("Form 5500s") filed by the Plans with the United States Department of Labor ("DOL"); discussions with Plan participants; filings by JPMorgan Chase & Co. ("JPMorgan" or the "Company") with the United States Securities and Exchange Commission ("SEC"); press releases and other public statements issued by the Company; media reports; and the "Report of JPMorgan Chase & Co. Management Task Force Regarding 2012 CIO Losses," published January 16, 2013. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

# I.   SUMMARY OF THE ACTION

1.      This is a class action brought pursuant to Section 502 of the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 against the Defendants,

fiduciaries of the Plan.

2.      The Plan is sponsored by JPMorgan Chase Bank, N.A. ("JPMC Bank") for

eligible employees and is a defined contribution plan.  This class action is brought on

behalf participants in the Plan whose individual accounts transacted in and/or held

JPMorgan common stock at any time between December 20, 2011 and July 12, 2012 (the

"Class Period").

3.      The basis of the action is that the Plan's fiduciaries were aware or should

have been aware of internal and external warnings indicating that JPMorgan faced

imminent multi-billion-dollar derivatives trading losses, its financial condition was far

worse than apparent from its public filings, and its past earnings were untrustworthy, but

instead ignored these internal and external warnings thereby breaching their duties of

prudence and loyalty to the participants under ERISA § 404(a), 20 U.S.C. § 1104(a), with

regard to the heavy concentration and continued investment in JPMorgan common stock

held under the Plan. The Plan did not require that JPMorgan stock be offered and did not

prohibit a suspension in the offering if it became imprudent, so the Plan's initial and

continued offering of JPMorgan stock were an exercise of discretion.

4.      Further, due to the excessive risk created by the extraordinarily large and

uncontrolled high-risk trading conducted within JPMorgan as described herein that

ultimately lead to multi-billion-dollar losses, an internal investigation, reorganization and

restatements of earnings by JPMorgan, it was imprudent for any fiduciary, under any

circumstances, to subject, or continue to subject, the Plan's assets to such risks.  The uncontrolled speculative internal trading imperiled and jeopardized JPMorgan.  As further explained below, Defendants were well-aware that JPMorgan had suffered critical if not mortal self-inflicted wounds that would cost it billions of dollars in reported losses, reputational damage, regulatory costs and long-reaching harm to its financial condition going forward that was  imminent and would seriously damage the price of company stock.

5.     Count I alleges that the Plan fiduciaries breached their duties and failed to manage and administer the Plan assets with the care, skill, prudence, and diligence of a prudent person under the circumstances by (i) continuing to offer JPMorgan stock after it was imprudent to do so; (ii) failing to provide complete and accurate information to Plan participants about the risk and prudence of  investing for retirement in JPMorgan stock; and (iii) permitting transactions by the Plan in JPMorgan common stock at artificially inflated prices.  These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designated to help provide funds for participants' retirement. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.     Count II alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that they knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue to offer JPMorgan stock as an investment option and investing Plan assets in JPMorgan stock without imposing any restrictions or warnings whatsoever when it was no longer prudent to do so.

7.     Count III alleges that certain Defendants failed to avoid or ameliorate conflicts of interest which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan and the Plan's best interests in mind.

8.     Count IV alleges that certain Defendants breached their duties and responsibilities as co-fiduciaries by knowing of breaches of fiduciary duties and failing to remedy them, knowingly participating in the breaches of fiduciary duties and/or enabling breaches of fiduciary duties.

9.     As discussed more fully below, during the Class Period, Defendants knew or should have known that JPMorgan stock had become an imprudent investment. JPMorgan's Chief Investment Office ("CIO"), which was its internal risk management center that was supposed to hedge its risks through credit derivatives and synthetic credit derivatives, had stopped hedging and was instead trading speculatively. For years, CIO engaged in speculative trading (rather than hedging) which materially boosted JPMorgan's financial results, accounting for reportedly 20% of earnings from 2007 through 2012.   The speculative CIO trading lacked the same oversight and risk limits as trading done by the investment banking side of the firm.

10.     Defendants knew or should have known that inevitably JPMorgan would suffer severe harm from CIO's rampant uncontrolled speculation, and the increased trading and risk it assumed in early 2012, which created billions in losses and caused the restatement of its earnings.  Defendants knew or should have known that JPMorgan had a "material weakness" in its risk controls and that it had for years materially understated its risks from CIO's risk-taking.  The Plan fiduciaries had monitoring obligations under which they had actual knowledge or should have known of these occurrences.  The total

impact that the structural changes to JPMorgan which resulted when the CIO trading and losses were revealed to its future financial results and stock price are unknown. Some analysts, citing the nearly limitless exposure comprised by the derivative trades engaged in by the CIO when the losses were first revealed, warned that their scale could cause the Company as a whole to fail. *See*, *e.g.*, David Chapman, "A JP Morgan Debacle In The Making?" at safehaven.com (noting that "if everything went wrong at once JPM's capital would be wiped out twice over and that the Company "could go bankrupt.").

11.     As the problems became known to them and/or the public, the Plan fiduciaries should have acted to protect participants from the foreseeable damage they would suffer from transacting in or holding JPMorgan stock, after it had become imprudent.  A prudent fiduciary would have ceased offering JPM stock through the Plan or otherwise restricted transactions in JPMorgan stock on a temporary or longer basis to avoid damage to the Plan during the Class Period; the Plan authorized them and others under their control to take these steps if they would protect the interests of Plan participants.

12.     Defendants are personally liable to the Plan for the losses resulting from each breach of fiduciary duty, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).  The Plan fiduciaries, as well as all co-fiduciaries, are liable to the Plan for losses caused by their breaches.  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek appropriate equitable relief including, without limitation, the equitable remedy of surcharge, restitution, monetary relief and lost profits from alternative prudent investments.

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

14.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

15.     Specifically, this district is an appropriate venue for this action because on recent Plan I.R.S. Form 5500 annual filings, the address listed for Defendant JPMorgan Chase Bank, N.A., the sponsor of the Plans, is in this district. Further, the principal executive offices of Defendant JPMorgan are located in this district. Additionally, it is likely that many of the parties and potential witnesses, including the Plan's administrative committee members, corporate executives and many Plan participants, are located in or within close proximity to this district.

## III.     PARTIES

### A.  <u>Plaintiffs</u>

16.     Plaintiff Matt Ward is a Plan "participant" within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  He is an employee who purchased and held JPMorgan shares in his retirement account through the Plan during the Class Period.

17.     Plaintiff Mary Loeza is a Plan "participant" within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  She is a former employee who purchased and held JPMorgan shares in her retirement account through the Plan during the Class Period.

B. **Nominal Non-Party Defendants**

18.     Defendant The JPMorgan Chase 401(k) Savings Plan (the "Plan") is an employee pension benefit plan under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Specifically, the Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  The Plan generally includes all active, full and part time salaried, U.S. Dollar–paid employees of JPMorgan and certain affiliated companies.

19.     The Plan is a legal entity that can sue and be sued. *See* ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party but relief is requested on behalf of, and for the benefit of, the Plan. Thus, the Plan is a nominal non-party.

C. **Corporate Defendants**

20.     Defendant JPMorgan Chase Bank, N.A. ("JPMC Bank") is a national banking association, headquartered in New York, New York.  Defendant JPMC Bank is a wholly-owned subsidiary of Defendant JPMorgan Chase, a financial holding company incorporated in Delaware.

21.     According to the Form 5500 for 2011 ("Form 5500"), as well as Plan-related documents, Defendant JPMC Bank is the Plan's sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B) and administrator pursuant to ERISA § 3(l6)(A), 29 U.S.C. § 1002(l6)(A). Defendant JPMC Bank is also a Trustee over the Plan's assets.  JPMC Bank is a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it has discretionary authority and control regarding the administration and management of the Plan and/or the Plan's assets.

22.     Defendant JPMorgan is a Delaware corporation headquartered in New York, New York and is the parent company of Defendant JPMC Bank. JPMorgan is a financial holding company, which provides various financial services worldwide and trades on the NYSE under the ticker "JPM." JPMorgan's principal executive offices are in New York, New York. Upon information and belief. Defendant JPMorgan is a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it has discretionary authority and control regarding the administration and management of the Plans and/or the Plan's assets.

**D.   The Committee Defendants**

23.     Defendant Employee Plan Investment Committee ("EPIC") was a "named fiduciary" under the Plan during the Class Period.  The EPIC exercised discretionary authority or control over the Plan's management and/or authority or control over management or administration of Plan assets.  The EPIC reported to, and was controlled by the Compensation & Management Development Committee.

24.     Defendant Compensation & Management Development Committee (the "CMDC") had the power and authority to interpret and administer the Plan and to appoint individuals to assist with Plan's administration including the EPIC.  The CMDC had the power to control the EPIC and, as such, exercised discretionary authority or control over the Plan's management and/or administration of Plan assets.

25.     Defendant Bernadette Barnosky nee Ulissi ("Ulissi") signed JPMorgan's Form 5500 as the individual signing as the plan administrator. Ulissi was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she

exercised discretionary authority or control over the Plan's management and/or authority or control over management or disposition of Plan assets.

26.     Defendant David C. Novak ("Novak") served as a member of the Committee during the Class Period. Novak was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plan's management and/or authority or control over management or disposition of Plan assets.

27.     Defendant Stephen B. Burke ("Burke") served as a member of the Committee during the Class Period. Burke was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plan's management and/or authority or control over management or disposition of Plan assets.

28.     Defendant Lee R. Raymond ("Raymond") served as a member of the Committee during the Class Period. Raymond was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plan's management and/or authority or control over management or disposition of Plan assets.

29.     Defendant William C. Weldon was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plan's management and/or authority or control over management or disposition of Plan assets.

30.     Defendant John Doe "Fiduciaries" 1-10 consist of the remaining members of the EPIC.  Because Plaintiffs are currently unaware of the true identities and capacities

of the remaining members of the EPIC, those individuals are named as John Does "Fiduciaries" 1-10.   The remaining members of the EPIC, whose real names will be substituted when they are known to Plaintiffs, exercised discretionary authority and discretionary control with respect to the management of the Plan and its assets.

31.     Defendants Ulissi, Burke, Novak, Raymond, Weldon and John Doe "Fiduciaries" 1-10 are collectively referenced herein as the "Committee Defendants."

**E.   The Officer Defendants**

32.     Defendant James Dimon ("Dimon") served as JPMorgan's Chairman, Chief Executive Officer ("CEO"), President, Member of the Executive Committee, Member of the Stock Committee and Member of the Operating Committee at all times applicable hereto.

33.     Defendant Ina R. Drew ("Drew") served as JPMorgan's Chief Investment Officer and Member of the Operating Committee at all times relevant hereto.

34.     Defendant Douglas L. Braunstein ("Braunstein") serves as JPMorgan's Executive Vice President and Chief Financial Officer ("CFO").  As CFO, Braunstein is also a "named fiduciary" under the Plan who had discretionary authority or control over the Plan's management and/or authority or control over management or disposition of Plan assets.

35.     Defendants Dimon, Drew and Braunstein are collectively referred to herein as the "Officer Defendants."

36.     During the Class Period, the Officer Defendants had control over the Corporate Defendants, the Committees, the Plan's fiduciaries and the Plan's management, and had access to material adverse non-public information was not

disclosed to Plan fiduciaries and/or participants.  The Officer Defendants had the ability and opportunity to ensure truthful and accurate disclosure and to prevent the issuance of misleading information provided to Plan fiduciaries and participants and the public. Thus, the Officer Defendants participated in the acts and omissions which breached fiduciary duties, or could have prevented those acts and omissions.

37.     The Officer Defendants are liable in the breach of fiduciary duty against the Plan and its participants who transacted in JPMorgan stock under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and liable as co-fiduciaries under ERISA § 405, 29 U.S.C. § 1105.

### IV.    JPMORGAN'S 401(K) SAVINGS PLAN

38.     The Plan is a defined contribution benefit plan that is sponsored by JPMC Bank for all JPMorgan employees. As of December 31, 2011, according to the Form 5500 filed by the 401(k) Plan, there were 271,145 participants in the Plan.  The Plan had total assets of approximately $14.4 billion.

39.     Under the Plan, eligible participants who are all full-time employees and part-time employees after 90 days may contribute up to 50% of their pre-tax income.  The Plan participants' contributions fund an account in their name held in trust with the Plan's trustee, JPMC Bank.  Certain Plan participants also are eligible for a matching contribution of up to 5% which is vested for all employees hired before May 1, 2009, and subject to three-year vesting for employees hired subsequently.

40.      Plan participants make their contributions through payroll deductions and can direct how their contributions are invested in their accounts.  As of December 31, 2011, the Plan offered 31 investment options including 22 core investment funds and 9

11

target date investment funds. One of the Plan's investment options is the JPMorgan

Chase Common Stock Fund which invests predominantly in JPM common stock. The

Plan did not require that JPMorgan stock be offered and did not prohibit a suspension in

the offering if it became imprudent, so the Plan's initial and continued offering of

JPMorgan stock were an exercise of discretion.

41.     The Company strongly encourages employees to invest for their

retirement through the Plan.  It has established websites for employees where they can

access their accounts, news and investment quotes.  It also sends newsletters to

employees in which investment through the Plan is encouraged with statements such as

"one of the most effective ways to save for retirement is through the 401(k) Savings

Plan" (*November 2009, Notice of Changes to JPMorgan Chase U.S. Retirement Savings

Plan*) and "skipping one $5 latte a week and investing in the 401(k) Savings Plan could

add up to an extra $10,000 in 20+ years. " (*November 2010, JPMorgan Retirement

Savings Plan Newsletter*).  The Company even established a "financial tool" called

"Retirement Dream Machine" which employees could use to estimate their projected

retirement savings.

**A.  The Plan Document And The "Named Fiduciaries"**

42.     The Plan is governed by the JPMorgan 401(k) Savings Plan effective

January 1, 2010, and reflecting all amendments through December 31, 2010 ("Plan

Document").  There is also a relevant First Amendment effective July 11, 2011 ("First

Amendment"), discussed below.

43.     The Plan Document sets forth the terms, conditions and provisions of the

Plan.  It also identifies and empowers the Plan Administrator and establishes and

empowers the Employee Plan Investment Committee ("EPIC").  Together, these are the "Named Fiduciaries" of the Plan.

44.     For example, the Plan Document sets out, in Section 12.1, the powers and duties of the Plan Administrator.  Section 12(a) states that the "[w]ithout limitation of the foregoing, the Plan Administrator shall have the duty to furnish, publish and file, as and to the extent required by ERISA, summary plan descriptions, plan descriptions, annual reports (including any financial statements) summary annual reports, and reports of Participants' benefits rights, and to maintain records with respect to the foregoing…" and "shall have the authority jointly to control and manage, as named Fiduciary, the operation and administration of the Plan…. These duties include the ability to oversee, monitor and/or restrict investment options for Plan participants."

45.     The Plan Document also establishes and sets forth, in Section 12.2, a Selection Committee which has the sole duty and responsibility to appoint the Employee Plan Investment Committee ("EPIC").  The Selection Committee is to consist of the current Chief Financial Officer and Director of Human Resources or such other persons appointed by the Board of Directors.

46.     Section 12.2(b) of the Plan Documents provides that the EPIC is a named fiduciary of the Plan "with respect to the selection of the Investment Funds" and "the selection and appointment of investment manager(s) with respect to such Investment Funds under the Plan."

47.     Section 12(c) provides that the Selection Committee, EPIC and Plan Administrator are "Named Fiduciaries" of the Plan.  This section also requires the EPIC to establish an "investment policy and a funding policy giving regard to the objectives of

13

the Plan, the short and long run financial needs thereof, and other factors as they deem appropriate."

48.     The "Named Fiduciaries" are also required to report to the Compensation and Management Development Committee ("CMDC") which, in turn, is appointed by the Board of Directors.

**B.   Duties And Responsibilities For Plan Investments**

49.     The Plan Document, in Section 6, sets forth certain duties and responsibilities that relate to "The Investment Funds" available under the Plan, including the JPMorgan Chase Common Stock Fund.  The First Amendment modified certain language in the Plan Document relating to the JPMorgan Chase Common Stock Fund.  However, neither the Plan Document, nor First Amendment mandates that the Plan invest in JPMorgan stock.  And neither prevents the Named Fiduciaries from temporarily or otherwise restricting or limiting investments by the Plan in JPMorgan stock due to its imprudence, or divesting out of JPMorgan stock if necessary.

50.     Section 6.1(a) of the Plan Document provides:

> The Employee Plan Investment Committee, in its sole discretion, shall designate the funds that shall be established and maintained by the Trustee under the Declaration of Trust as Investment Funds for the investment of Plan Accounts. The Employee Plan Investment Committee can change or modify Investment Funds or their managers in its discretion.  **The Administrator shall have absolute discretion to restrict transfers and allocations among Investment Funds**. (Emphasis added.)

51.     Under the bold language of Section 6.1(a), the Plan Administrator can place restrictions or limit the Plan's investment or allocations to JPMorgan stock during times, either temporarily or otherwise, when it has become imprudent.

52.     The First Amendment provided that "Section 6.1(a) is revised to clarify that the Employee Plans Investment Committee has had no discretion with respect to the JPM Chase Common Stock Fund by adding "other than the JPMorgan Chase Common Stock Fund" after the word "fund" in the first sentence and after the word "Funds" in the second sentence.

53.     This change simply prevents the EPIC from acting alone with regard to the JPM Chase Common Stock Fund, i.e., without the Plan Administrator, Selection Committee and/or Trustee, and there is no language or provision in the Plan Document, First Amendment or other Plan-related document which expressly or even impliedly prevents any of the fiduciaries from placing prudent restrictions or limits on investing in JPMorgan stock.

54.     In fact, other Plan-related documents, including the Trust Agreement, empower limits and restrictions on JPMorgan stock.  For example, the Plan's Form 5500 for 2011, the Financial Statements in Footnote 4 describe the "Investment Program" and state "at its discretion, JPMorgan Chase Bank N.A. may place restrictions on investments in the funds and on daily transfers and reallocations among the funds."  This statement is repeated in the Form 5500s filed for 2009 and 2010.

55.     In the Plan's Form 11-K filed with the SEC on June 28, 2012,  there is the same disclosure that "[a]t its discretion, JPMorgan Chase Bank N.A. may place restrictions on investments in the funds and on daily transfers and reallocations among the funds."  This statement also appeared in the 11-Ks filed by JPMorgan for the Plan in 2010 and 2011.

### C. **The Trust Agreement**

56.     The Plan executed a Trust Agreement with JPMC Bank on December 31, 2004, which was updated last on August 2010.  Under Section 13.2, the Trust Agreement is deemed to be part of the Plan and "any and all rights and benefits that may accrue to any person under the Plan shall be subject to all terms and provisions of the Trust."  The Trust Agreement reflects the powers and authority of the Committee, designates Named Fiduciaries for the Plan, and sets forth JPMC Bank's independent powers and authority as trustee.

57.     Section 4.1(a) of the Trust Agreement reflects broad duties of the Committee:

- The Committee may also provide instructions to eliminate one or more of the Investment Accounts…[no limitation was made for the JPMorgan Chase Common Stock Fund].
  ***
- The Committee shall, from time to time, provide the Trustee with Instructions setting forth a specific short-term alternative, which the Trustee shall use for the investment of any cash in the Trust Fund.  Such short-term investment alternative may be a money market mutual fund, collective, commingled or group trust which is a short-term investment fund maintained by the Trustee, or interest bearing deposit accounts, including deposit accounts with the Trustee.

58.     Under Section 4.3 of the Trust Agreement, the "Trustee shall, if so directed by the Committee in written Instructions, segregate all or a portion of the Trust Fund held by it into one or more separate investment accounts to be known as Company Directed Accounts with respect to which the Committee shall have the powers and duties granted to an Investment Manager under this Agreement."

59.     Sections 4.1 and 4.3 of the Trust Agreement demonstrate that the EPIC has the authority to establish "short-term alternatives" for any cash contributions under the Plan, and that it could establish and manage its own Company Directed Account.

These powers permit the EPIC to temporarily hold new cash contributions by Plan participants in cash or a segregated account while JPMorgan stock was temporarily imprudent or trading at artificially inflated prices.

60.     Moreover, JPMC Bank, as Trustee of the Plan, had its own fiduciary duties of prudent management over the JPMorgan Chase Common Stock Fund.  Section 4.6 of the Trust Agreement provides:

> If, and to the extent specifically authorized by the Plan, the Committee may provide instructions directing the Trustee to establish one or more accounts, the assets of which shall be invested primarily in securities that constitute "qualifying employer securities" ("Company Stock") or "qualifying employer real property" within the meaning of Section 407 of ERISA.  **It shall be the duty of the Committee to determine that such investment is not prohibited by 406 and 407 of ERISA**.  Notwithstanding any provision of law, regulation or other guidance issued by the Department of Labor to the contrary, the Committee shall at all times have the full fiduciary responsibility with respect to the investment of any such Investment Account, and **the Trustee's responsibilities with respect to such an Investment Account shall be no different than if an Investment Manager were appointed with respect to that Investment Account**. (Emphasis added.)

61.     Thus, JPMC Bank had the duty to prudently manage the JPMorgan Chase Common Stock Fund as though it was an "Investment Manager," including the duty to restrict new investments or diversify out of JPM stock and into cash when appropriate.

62.     This fiduciary nature of the Trustee's duty is reinforced in Section 6.2 of the Trust Agreement which provides that "[f]or purposes of ERISA, it is recognized that the Company, the Trustee and any duly appointed Investment Managers…are fiduciaries, but only with respect to those specific powers, duties, responsibilities and obligations as are specifically given to them under the Plan or this Agreement that constitute each a fiduciary."

63.     Finally, the Trust Agreement further provides, at Section 6.5, that ERISA controls with respect to fiduciary duties, and that any attempts to restrict responsibilities or liabilities will not be effective if inconsistent with the requirements of ERISA. Section 6.1 of the Trust Agreement provides in subsection (a) that the "Trustee shall be responsible for the performance of only such duties as are set forth in this Agreement…or are imposed on the Trustee by ERISA."

**D.  The Summary Plan Descriptions And Fund Profiles**

64.     Pursuant to its obligations under ERISA, Defendants authored and issued "Summary Plan Descriptions" to Plan participants.  The "Summary Plan Description" dated January 2008 ("Jan. 2008 SPD") contained, on page 54, a self-styled "Prospectus" which expressly incorporated 1) its most recent annual report on Form 10-K, 2) all reports filed since the most recent Form 10-K, and 3) a description of its common stock filed on Form 10.   The Jan. 2008 SPD also specifically stated that these documents were available and could be obtained at no cost by writing to the Corporate Secretary.

65.     Though the Jan. 2008 SPD included this "Prospectus" with its reference to its JPMorgan's SEC filings, there also appeared a disclaimer asserting that these were not part of the SPD.   This transparent attempt at disclaiming responsibility fails, and is legally ineffective, because the written material appears within the SPD sent to Plan participants, along with 54 other pages of communications required under ERISA.  To avoid communicating within an SPD that is subject to ERISA, Defendants would have had to communicate separately from and outside of an SPD sent to Plan participants pursuant to ERISA.

66.     Defendants also repeatedly advised Plan participants that prospectuses or other information about the investment funds offered through the Plan were available through the web center.  For example, the *May 2011 Retirement Savings Plan Newsletter* states "for more information about all of the funds currently available to you, visit the 401(k) Savings Plan Web Center through MyRewards@Work."  The *October 2010 Notice of Investment Fund Changes Under the 401(k) Savings Plan Effective November 30, 2011* includes "…[i]t's important that you make informed investment decisions only after carefully reading all the plan information (including mutual fund prospectuses and the 401(k) Savings Plan Investment Fund Profiles Brochure) available through the JPMorgan 401(k) Savings Plan web Center or Call Center."

67.     The January 2012 401(k) Savings Plan Investment Fund Profiles Brochure ("Funds Brochure") contains short, summary descriptions of the funds available under the Plan.  There is also a short description of the JPMorgan Common Stock Fund which is described as a "single common stock fund passively managed by the Trustee".  Under "Investment Strategy and Fees", the description states that the Fund invests "primarily in shares of common stock of JPMorgan Chase & Co.," but also adds that "depending on market conditions,…the Fund will also hold varying levels of cash/short-term liquid investments as cash reserves."

68.     While the Funds Brochure states that there is "high risk" associated with the JPMorgan Common Stock Fund, there is no meaningful disclosure of material risks associated with the Fund or Company stock as an investment.  The Funds Brochure, and other communications to Plan participants about the Investment Funds, fail to fully communicate the material risks or the extent of such risks associated with the JPMorgan

Chase Common Stock Fund.  Plan participants receiving and relying upon the SPD and Funds Brochure would believe that they had all material information when, in fact, they did not.  Defendants knew or should have known that their communications to Plan participants about the JPMorgan Chase Common Stock Fund were insufficient.

**E.   The Plan's Concentration in JPM Stock**

69.    Before the Class Period, Defendants knew that the Plan was heavily concentrated in JPM stock.   The Plan's Form 5500s reflect the following holdings of JPM stock:

| Year | JPM shares | Value |
|------|-----------|-------|
| 2010 | 65, 785, 285 | $2, 790, 611, 790 |
| 2011 | 68,175, 776 | $2, 266, 844, 552 |

70.    Footnote 7 of the Plan's Form 5500 for 2011 shows that in 2011, there were total purchases of $822,413,559 of JPM stock, and in 2010, there were total purchases of $662,290,586 of JPM stock.

71.    Defendants also knew that the JPMorgan Chase Common Stock Fund had no diversification.  Footnote 12 of its 2011 Form 5500, states "[t]he Plan's exposure to a concentration of credit risks is limited by its diversification of investments across 31 (as of December 31, 2011) investment fund elections.  Additionally, the investments within each Fund are diversified into various financial instruments, with the exception of the JPMorgan Chase Common Stock Fund, which invests predominantly in JPMorgan Chase & Co. common stock."

72.    In other instances, the 2011 Form 5500 discloses that the Plan used credit derivatives and other hedging techniques to offset its concentrated credit risk, interest rate or currency risks; however, Defendants never disclosed the actual extent of such risks.

73.     By the time of the Class Period, JPM stock had become an imprudent investment.  Defendants should have taken actions to restrict new investments in JPM stock and/or diversify out of JPM stock.  As a result of Defendants' failures, the Plan suffered substantial losses and damage from its transactions in and holding of JPM stock.

**F.  The Plan's Significant Losses During the Class Period**

74.     On December 20, 2011, at the start of the Class Period, JPMorgan's stock price closed at $32 per share.  Over the next several months, the stock price rose to $45 per share, trading at artificially high prices, then it began to fall as the truth began to emerge about its faulty risk controls and the resulting trading losses.

75.     On July 12, 2012, at the close of the Class Period, JPMorgan's stock price closed at $34.04.

76.     During the Class Period, Plan participants who invested in JPMorgan common stock at artificially high prices were substantially damaged. Plan participants who sold out of JPMorgan common stock in response to the sudden disclosures were substantially damaged. Plan participants were relying upon the integrity of the market price of JPMorgan common stock and market information relating to JPMorgan, and have been damaged thereby.

77.     Notwithstanding any efficiency of the price of JPMorgan common stock, by the beginning of the Class Period, a simple investigation by Defendants into the high-risk trading strategies employed by the CIO, lack of risk limits on CIO trades and the potential impact CIO losses would have on JPM's financial condition, would have revealed the potential size of the imminent liability the company was facing and would

have further provided Defendants with confirmation that continued investment in company stock was imprudent.

78.     Plan participants also suffered damage as measured by the difference between holding JPMorgan common stock versus investment alternatives under the Plan.

79.     Had Defendants acted prudently by suspending transactions in JPMorgan stock through the Plan or divesting out of JPMorgan stock, Plan participants would have avoided the substantial damage suffered.

## V.  FACTS BEARING ON FIDUCIARY BREACH

### A.  Background Events Before Class Period

80.     December 20, 2011, the start of the Class Period, was the point in time in which JPMorgan's dire financial condition was, or should have appeared, imminent to Defendants.  Based on the looming multi-billion dollar liability that was discussed at length within the upper management within JPMorgan, as well as within the fiduciaries of the Plan, Defendants had every reason to be strictly monitoring and closely following JPMorgan stock as a potentially imprudent investment.  The Financial Crisis of 2008 witnessed the bankruptcy, bailout or restructuring of nearly every single large bank and financial firm on Wall Street.  Due to liquidity problems associated with "toxic" mortgage exposure, Lehman Brothers filed for bankruptcy and Citigroup received a $300 billion government bailout.  In the fallout, the smaller banks and financial firms suffered similar problems including balance sheet impairments, restructurings and lawsuits.

81.     The bank failures and bailouts during the Financial Crisis can largely be attributed failures by financial institutions to properly identify and manage their risks. The lack of proper risk controls and risk systems was a central conclusion of the United

States' Senate Financial Crisis Inquiry Commission ("FCIC") in its published Report of January 2011.

82.     On  January 13, 2010, Jamie Dimon, JPMorgan's CEO,  testified before the FCIC, stating:

> Throughout the financial crisis, JPMorgan Chase never posted a quarterly loss, served as a safe haven for depositors, worked closely with the federal government, and remained an active lender to consumers, small and large businesses, government entities and not-for-profit organizations. As a result of our steadfast focus on risk management and prudent lending, and our disciplined approach to capital and liquidity management, we were able to avoid the worst outcomes experienced by others in the industry

83.     During 2009 through 2011, there was growing evidence that JPMorgan lacked the strong risk management systems and "disciplined approach" that Dimon had claimed.

84.     As of December 31, 2011, JPMorgan set aside $5.1 billion in reserves for ongoing litigation and regulatory actions.  This includes numerous lawsuits against JPMorgan to recover losses suffered from mortgage-backed securities ("MBS") offerings, which totaled over $120 billion.  The SEC was also investigating the underwriting of MBS offerings.  JPMorgan was sued and under regulatory investigation for LIBOR rate manipulation.  JPMorgan was the subject of antitrust litigation for Visa / Mastercard charges involving annual fees of over $40 billion.  JPMorgan was further the subject of civil and possibly criminal charges brought by the City of Milan over a bond/swap transaction; claims by the Lehman Brothers Unsecured Creditors Committee for $8.6 billion in wrongful transfers; and litigation by the Madoff Trustee.

85.     In sum, by the start of the Class Period, JPMorgan faced regulatory investigations and civil lawsuits on several fronts, implicating failures with its crucial risk

management systems and controls.  The exposure to JPMorgan was many billions of dollars, with reserves set at $5.1 billion.  These mounting legal troubles stand in stark contrast to Dimon's testimony.  The disparity should have raised a further "red flag" that JPMorgan did not have a full grasp of its risks or control over them.

86.     As a result, Defendants, as Plan's fiduciaries, should have been monitoring JPMorgan stock closely for whether it continued to be a prudent investment for the Plan, as these problems occurred and expanded in scope.  Plan fiduciaries also had knowledge that JPMorgan stock had become imprudent based on risky speculative internal trading that was uncontrolled and beyond normal risk management and oversight.

### B.  Before Class Period CIO Was Known To Engage In Uncontrolled Speculative Trading

87.     During the Class Period, as well as for years earlier, JPMorgan had a business unit called its Chief Investment Office ("CIO").  The CIO's stated purpose was to monitor and hedge the Company's corporate and business risk.  CIO served as the risk management control center for JPMorgan and was the supposed foundation on which Dimon's testimony about the strength of JPMorgan's risk management was based.

88.     For example, in its annual report filed on Form 10-K for 2010 on February 28, 2011, JPMorgan described the CIO as follows:

> The Corporate/Property sector comprises Private Equity, Treasury [the "Treasury"], the Chief Investment Office ("CIO"), corporate staff units and expense that is centrally managed.  The Chief Investment Office and Corporate Treasurer are responsible for measuring, monitoring, reporting and managing the Firm's liquidity, interest rate and foreign exchange risk and other structural risks.
>
> * * *
>
> CIO is primarily concerned with managing structural risks which arise out of various business activities of the firm.

Substantially similar descriptions are repeated in the 2011 Annual Report filed on Form

10-K on February 29, 2011.

89.     To manage and offset risk from JPM's business activities, CIO engaged in credit derivatives, synthetic credit derivatives and other trades and investments that were immense in size.  These trades were supposed to be hedging and risk-offsetting trades to guard against existing risk from the Company's investments and operations, and not speculative positions that created their own risks for JPMorgan.

90.     However, for years, CIO had engaged in speculative trading that was not simply done to manage risk, and its positions were growing each year.  From 2007 to 2012, CIO's portfolio increased 500% from $76 billion to $359 billion.  During 2011 and 2012, CIO's assets were larger than five of the other business segments of JPMorgan; only investment banking was larger.  According to Bloomberg, David Olsen, a former head of credit trading for the CIO in North America hired in 2006 was told that CIO's role was to "ramp up the ability to generate profit for the firm" and that generating profit through CIO was "Jamie's new vision for the company."

91.     After-the-fact, JPMorgan for the first-time disclosed CIO's contribution to earnings.  CIO's synthetic-credit portfolio reportedly accounted for at least 20% of the Company's net income during most of 2010 through mid-2012, and a total of $2 billion during 2007 – 2011.   CIO also reportedly made $1 billion betting against subprime during 2007 to 2008.   Analysts have noted that CIO's contributions to earnings were understated.  According to *Bloomberg* on June 12, 2012, an analysis done by Portales Partners concluded that CIO contributed as much as $.80 per share during the last two years.

92.     CIO trading at JPMorgan also lacked the same risk controls and oversight.
CIO was housed in JPMorgan's Corporate Division alongside its Treasury Department,
away from where regulators were stationed.  The New York Times reported that while
JPMorgan had 110 federal regulatory personnel embedded inside the company, none was
located in CIO.

93.     CIO trading also grew rapidly without a proportionate increase in risk
management staff or technology.  According to the Telegraph, JPMorgan's former CFO
Cavanaugh stated that the "level of scrutiny of CIO did not evolve commensurate with its
increased complexity…So as a result, we collectively ended up with a level of scrutiny
that fell short of the high standards we apply to our client businesses, especially as the
complexity increased."

94.     JPMorgan senior executives knew that CIO lacked sufficient risk controls
and oversight.  In 2009, Bill Winters (Winters") and Steven Black ("Black"), then co-
CEOs of the Investment Bank, questioned Dimon about CIO's proprietary trading and the
adequacy of its risk management.  Winters and Black asked for more disclosure and
detail of CIO's risk positions, and wanted to involve members of the Operating
Committee. These requests were never implemented.  According to a *Bloomberg* report
on June 12, 2012, Winters and Black also sought for the Company to subject CIO to a
Risk Exploration and Transparency Unit ("RETU"), a team of specifically trained risk
analysts used to assess risk in other divisions engaged in complex trading.   This also was
never done.

95.     The Plan fiduciaries, particularly the CFO, were well aware that CIO
engaged in uncontrolled speculative trading.  This trading was integral and material to

JPMorgan's earnings for years, and failed to fulfill CIO's ostensible purpose and goal of managing and minimizing risk.  The Plan fiduciaries knew or should have known pursuant to their duties to monitor JPMorgan prudence as an investment that CIO trades were a source of its earnings, and that its financial condition and prospects were entwined with CIO's trading performance.

## B. CIO's Increased Positions Imperil JPMorgan's Financial Condition

96.     Beginning as early as in or about August 2011, CIO massively expanded and increased the size and risk of its speculative internal trading positions.  During this time, CIO engaged in a series of credit-related derivatives transactions that culminated in huge positions which involved substantial amounts of JPMorgan's capital,  carried material levels of risk, and posed increased risks.  The magnitude and risks to the Company from CIO's trading positions far transcended the purpose of hedging, and jeopardized and imperiled JPM's financial position.. According to multiple media reports, JPMorgan masked the true size of CIO's trading losses (as it related to the Company's earnings) through a series of accounting moves, highly aggressive tax write-offs, and the notable shrinking the amount set aside as loan-loss reserves, among other techniques. . *See*, *e.g.*, Stephen Gandel, "How Jamie Dimon Hid the $6 Billion Loss" at *Fortune.com*, July 13, 2012 (quoting bank analyst Christopher Whalen: "I think they did as much manipulation as they could have to hide the loss."). These maneuvers make it difficult to precisely assess the impact of the losses on the Company's overall financial health and viability.  However, it was clear from the time that the media began reporting on the CIO losses, that JPMorgan would take an unprecedented hit – billions of dollars in

losses, restated earnings, restructuring and enormous costs going forward to revamp its risk management systems.

97.     Defendants who were Plan fiduciaries knew or were reckless in being unaware of the seriousness and magnitude of the risks from the CIO's trades and positions, and the deleterious impact they would have on JPMorgan.  Braunstein, JPMorgan's CFO, was a Plan fiduciary and, as such, received reports of the CIO's trades, positions and risk assessment.

98.     According to the *New York Times*, in November 2011, hedge fund manager Boaz Weinstein ("Weinstein") identified *a* di*verg*ence between the price of the Markit CDX North American Investment Grade Series 9-10 Year Index (the "IG.9 Index"), a tradable index designed to track a portfolio of credit default swaps of investment-grade rated companies, and the value of the theoretical portfolio underlying the IG.9 Index.  *See* Azam Ahmed, *The Hunch, the Pounce and The Kill*, *New York Times*, May 26, 2012.  Although unknown to Weinstein at the time, this divergence was due in substantial part to the trading patterns at JPMorgan's CIO that led to the Company's massive exposure to the IG.9 Index during 2011 and 2012.

99.     On April 6, 2012, *Bloomberg* issued a report entitled *JPMorgan Trader's Positions Said to Distort Credit Indexes.*  According to the report, "[a] JPMorgan Chase & Co. trader of derivatives linked to the financial health of corporations has amassed positions so large that he's driving price moves in the $10 trillion market."

100.     At or about this same time, media reports emerged of a London-based trader at JPMorgan who had taken enormous speculative positions trading derivatives that had distorted markets.  This London-based trader, who became known as the

"London Whale" trader, was Boris Iksil who worked in the CIO group. Iksil's speculative derivatives trades caused JPMorgan to incur losses that have been reported to be at least $5 billion and as high as $10 billion, and growing. This trading was the result of JPMorgan's material change in methodology for calculating VaR (a risk measure used by the firm) which enabled trades to take on more risk. As discussed herein, Iksil and several of his co-workers and/or managers engaged in a conspiracy to falsify the values of the CIO trading positions to hide losses.

101.    When the truth about the activities that had been ongoing within the CIO was eventually revealed, the reaction was swift and severe.

102.    Among other effects, the Company immediately eliminated twenty investment banking positions in its London office, the office responsible for the loss. The Company also quickly sold off approximately $25 billion in profitable securities, ostensibly to help counter the mounting CIO loss. JPMorgan conducted a lengthy internal investigation and has restructured various divisions.

103.    In the immediate aftermath of the disclosure, Fitch Ratings downgraded JPMorgan's long-term Issuer Default Rating from AA- to A+ and its short-term Issuer Default Rating from F1+ to F1. Fitch Ratings also announced that it had changed its long-term outlook for the Company to "Ratings Watch Negative." Moody's Investors Service followed Fitch, and lowered its rating on JPMorgan's long-term senior debt from A2 to Aa3.

104.    Law enforcement and regulatory response was nearly immediate as well. In the wake of the massive trading loss, JPMorgan became the subject of several governmental investigations. The Department of Justice, the Federal Bureau of

Investigation, the Federal Reserve, the Securities and Exchange Commission and the Commodities Future Trading Commission all began investigations into the Company's conduct. In addition, the Company is now the subject of several multi-million-dollar class action lawsuits.

105.    JPMorgan has also taken an enormous hit to its reputation.  The Company was noted for its risk management controls, and Dimon was a strong advocate for the ability of banks to self-regulate and handle their own risk management.  JPMorgan's stellar reputation has been tarnished which has cost it an incalculable loss of business.

106.    The increased speculative trading done by Iksil and the CIO violated its purpose which was supposedly to manage risk.  Again, JPMorgan's internal risk management controls and oversight failed and put JPMorgan in jeopardy, which was or should have been foreseeable to Plan fiduciaries.  The CIO trades and actions of its members violated fiduciary duties and obligations of loyalty and prudence which the Company owed to Plan participants who invested in JPMorgan stock.

107.    Had Defendants performed any review of JPMorgan stock (particularly had its CFO reviewed risk reports from CIO) or had Plan fiduciaries adopted sufficient procedures for monitoring the stock, they should have concluded that JPMorgan stock was an imprudent investment. Defendants knew that the risks associated with CIO's increased speculative trading positions were not factored into the stock price, and that any Plan participants who invested in JPMorgan stock until there was full disclosure of these events would purchase at artificially high prices.  As a result, Defendants should have frozen or halted transaction in JPMorgan stock through the Plan or, at a minimum,

instituted an evaluations of JPMorgan before continuing to make it available without any restrictions under the Plan.

### C. **JPMorgan's Disclosure Failures**

108.    Defendants knew that Plan participants lacked materially relevant information about the CIO trades, as well flaws in the Company's risk controls.  As officers or members of the Board of Directors, certain Defendants had access to information about the CIO trades, and knew that the information had not been disclosed to the public.

109.    Defendants also knew or should have known that Plan participants received the SPD which incorporated JPMorgan's most recent 10-K and all subsequent SEC filings, and that these gave Plan participants a false and misleading impression of its financial condition, risks and health.  Furthermore, the disclosures which JPMorgan did make during the Class Period contained numerous false and misleading statements and omissions about the CIO trades, the magnitude and risks.  These false statements were also incorporated into the SPD, and certified by the CFO, a Plan fiduciary.

110.    On January 13, 2012, JPMorgan filed a Form 8-K which set forth the Company's operational and financial results for the three- and twelve-month periods ending December 31, 2011.  In this filing, the Company stated that the VaR for the CIO for the prior three-month period was $69 million and for the prior twelve-month period was $57 million.

111.    JPMorgan's VaR was its purported measure of the risk of its positions.[1] The three-month reported number of $69 million number represented the maximum likely loss on the CIO's positions. Specifically, by stating that the CIO's VaR was $69 million, JPMorgan was representing that in 95% of likely scenarios, the maximum amount the CIO's positions would lose was $69 million. JPMorgan stated, in its earnings release supplement on April 13, 2012, that "CIO VaR includes positions, primarily in debt securities and credit products, used to manage structural risk and other risks, including interest rate, credit and mortgage risk arising from the Firm's ongoing business activities." JPMorgan also emphasized that CIO trading was done to reduce or minimize other risks within the Company.

112.    In its January 13, 2012 Form 8-K, JPMorgan also reported data relating to the value and performance of the combined securities investment portfolio of CIO and Treasury. This portfolio was reported to have a period-end value of $356 billion, which represented a $13 million loss during the fourth quarter.

113.    However, by December 31, 2011, the CIO's portfolio and operations posed a far greater threat to the Company's net income and profitability than could be inferred from the public statements. In fact, the risk associated with the CIO's investment portfolio rose to $186 million by the end of March 2012 – four times the risk reported on June 30, 2011, and more than double that reported as of December 31, 2011.

114.    On February 29, 2012, JPMorgan filed its Form 10-K Annual Report. In this Form 10-K, JPMorgan reported that the CIO's period-end VaR was $77 million as of December 31, 2011. The Company also described the VaR as a "consistent cross-

---

[1] VaR measures can be misleading because they fail to capture "tail risk," which is what caused them to be worthless during the financial crisis of 2008. Since 2009, the Basel Committee on Banking Supervision has recommended that banks replace VaR models to better take into account possible "tail risk" events.

business measure of risk profiles and levels of diversification and is used for comparing

risks across businesses and monitoring limits," and stated that VaR "measures risk across

instruments and portfolios in a consistent, comparable way." *See* Feb. 29, 2012 Form 10-

K at 158.

115.    Also, in the February 29, 2012 Form 10-K, JPMorgan included data

related to the value and performance of the combined securities investment portfolio of

the Treasury and CIO.  This portfolio was reported to have a period-end value of

approximately $356 billion, which represented a $1.385 billion gain during 2011.

116.    CFO David Braunstein, a Plan fiduciary, certified the Form 10-K which he

knew would be incorporated into the SPD as a communication to Plan participants.  In his

Certification, Braunstein acknowledged that he disclosed to auditors and the audit

committee "all significant deficiencies and weaknesses in the design or operation of any

internal control over financial reporting" and "any fraud, whether or not material, that

involves management or other employees who have a significant role in the registrant's

internal control over financial reporting."  This certification was untrue.

117.    On April 13, 2012, JPMorgan filed a Form 8-K with the SEC and issued

an earnings release for the first quarter of 2012, the period ending March 31, 2012.

Under the heading "Quarterly Trends", the Company reported that the average value of

the Treasury and CIO investment securities portfolio had increased 3% since the previous

quarter.  The period-end value of the portfolio was approximately $375 billion, which

represented a $453 million gain during the quarter.  JPMorgan also reported that the VaR

for the CIO's positions had declined from $69 million in the fourth quarter of 2011 to $67

million in the first quarter of 2012.

118.    In addition, JPM also described VaR as the "measure of the dollar amount of potential loss from adverse market moves in an ordinary market environment," and that it "measures risk across investments and portfolios in a consistent, comparable way." No disclosure was made that JPMorgan had modified its method of calculating VaR, or materially changed its VaR calculation in any way.

119.    On April 13, 2012, JPMorgan held a conference call with analysts and investors to discuss its earnings for the first quarter of 2012 ("First Quarter Conf. Call"). During the call, the Company made numerous statements about the CIO's activities which had come under media scrutiny.  In his opening remarks, CFO Braunstein, stated, in pertinent part, as follows:

> [b]efore I turn it over to Jamie, I did want to talk about the topics in the news around CIO and just sort of take a step back and remind our investors about that activity and performance.
>
> We have more liabilities, $1.1 trillion of deposits than we have loans, approximately $720 billion. And we take that differential and we invest it, and that portfolio today is approximately $360 billion. *We invest those securities in high grade, low-risk securities*.
>
> We have got about $175 billion worth of mortgage securities, we have got government agencies securities, high-grade credit and covered bonds, securitized products, municipals, marketable CDs. *The vast majority of those are government or government-backed and very high grade in nature*.
>
> We invest those in order to hedge the interest rate risk of the Firm as a function of that liability and asset mismatch. We hedge basis risk, we hedge convexity risk, foreign exchange risk is managed through CIO, and MSR risk. We also do it to generate NII, which we do with that portfolio.
>
> The result of all that is we also need to manage the stress loss associated with that portfolio, and so we have put on positions to manage for a significant stress event in Credit. We have had that position on for many years and the activities that have been reported in the paper are basically part of managing that stress loss position, which we moderate and change over time depending upon our views as to what the risks are for stress loss from credit.

*All of those decisions are made on a very long-term basis. They are done to keep the Company effectively balanced from a risk standpoint. We are very comfortable with our positions as they are held today.*

And I would add that all those positions are fully transparent to the regulators. They review them, have access to them at any point in time, get the information on those positions on a regular and recurring basis as part of our normalized reporting.

*All of those positions are put on pursuant to the risk management at the Firm wide level.*

The last comment that I would make is that based on, we believe, the spirit of the legislation as well as our reading of the legislation and consistent with this long-term investment philosophy we have in CIO we believe all of this is consistent with what we believe the ultimate outcome will be related to [the] Volcker [Rule].

(Emphasis added.)

120.    Later, during the question and answer session in the First Quarter

Conference Call, Dimon was asked directly about the CIO's large positions and he

dismissed any concerns. The following exchange took place:

**Guy Moszkowski - BofA Merrill Lynch Analyst** –
Good Morning. On the CIO question, which obviously you have addressed and has gotten so much attention in the press this week, can I just ask one further question, which is, are all of the results of the CIO group reflected only within Corporate and Other? There is no sharing of any of those results with, say, FICC in terms of the reporting that we would see in the Investment Bank?

**Jamie Dimon - JPMorgan - Chairman & CEO** –
No, God, no. No, no. A lot of the NII is given to the businesses that generate the deposits on a consistent fund transfer methodology, which - but not in the Investment Bank. Remember, most of that portfolio is an AFS portfolio, not all of it, but most of it.

**Guy Moszkowski - BofA Merrill Lynch - Analyst** –
Right, fair enough. It's just I (multiple speakers)

**Jamie Dimon - JPMorgan - Chairman & CEO** –
We disclosed both realized gains, unrealized gains, and market-to-market gains. You get all of that.

**Guy Moszkowski - BofA Merrill Lynch - Analyst** –
Yes, that is just a question that I ask in order to sort of assess the tempest in the teapot nature of the stories relative to the revenues that we see that just don't seem to be that big.

**Jamie Dimon - JPMorgan - Chairman & CEO** –
*It's a complete tempest in a teapot.* Every bank has a major portfolio; in those portfolios you make investments that you think are wise *to offset your exposures.*

Obviously, it's a big portfolio; we are a large company and we try to run it it's sophisticated obviously with complex things. But at the end of the day that is our job is to invest that portfolio wisely, intelligently over a long period of time to earn income *and to offset other exposures that we have.*

(Emphasis added.)

121.   The statements referenced above were materially false and misleading because the CIO's portfolio and operations materially differed from those disclosed, or were reckless with regard to the truth of the statements.  Defendants, particularly CFO Braunstein, knew or should have known that these statements were untrue.

122.   JPMorgan's speculative CIO  trading generated enormous losses for the Company, and JPMorgan changed its VaR model so that its disclosures on potential for losses were not truthful or accurate.  These actions breached fiduciary duties owed to Plan participants who were invested or considering investing in JPMorgan stock.  The actions also made JPMorgan stock an imprudent investment option that should have been frozen until it could be evaluated further.

123.   The statements made in the January 13, 2012 Form 8-K about the values of the combined portfolios of the Treasury and CIO were false and misleading because improperly inflated values were used on the derivatives in the CIO's portfolio, and operational results and financial positions of JPMorgan stated in the 8-K were false and misleading.

124.    JPMorgan's statements describing its VaR model in its 10-K reported for 2011, and April 13, 2012 earning release, and the VaR calculations provided for the CIO's portfolio in the January 13, 2012 8-K, the February 29, 2012 10-K and the April 13, 2012 8-K and earnings release, were false and misleading because they relied on inflated values of assets and an undisclosed changed methodology for calculating VaR. The change in VaR materially understated the risks, as well as misled investors about the risks associated with the CIO's positions. The inflated values and VaR understatements are discussed more fully below.

125.    During the April 13, 2012 Conference Call, Dimon and Braunstein made numerous false and misleading statements concerning the nature, quality and risks associated with the CIO's positions, the accuracy and reliability of the SEC filings and reported disclosures made by JPMorgan.

126.    The April 13, 2012 Form 8-K also contain statements about the values of the combined portfolios of the Treasury and CIO that were false and misleading because improperly inflated values were used on the derivatives in the CIO's portfolio, and operational results and financial positions of JPMorgan stated in the 8-K were false and misleading.

127.    These statements were all incorporated into the SPD as communications by the Plan fiduciaries to its participants.

**D.  The Truth Begins To Emerge**

128.    The truth first began to emerge on May 10, 2012. On this day, JPMorgan filed its Form 10-Q for the quarter ended March 31, 2012, with the SEC. The 10-Q disclosed, in relevant part:

In Corporate, within the Corporate/Private Equity segment, net income (excluding Private Equity results and litigation expense) for the second quarter is *currently estimated to be a loss of approximately $800 million.* (Prior guidance for Corporate quarterly net income (excluding Private Equity results, litigation expense and nonrecurring significant items) *was approximately $200 million.*) Actual second quarter results could be substantially different from the current estimate and will depend on market levels and portfolio actions related to investments held by the Chief Investment Office (CIO), as well as other activities in Corporate during the remainder of the quarter.

*Since March 27, 2012, CIO has significant mark-to-market losses in its synthetic credit portfolio, and this portfolio has proven to be riskier, more volatile and less effective as an economic hedge than the Firm previously believed.* The losses in CIO's synthetic credit portfolio have been partially offset by realized gains from sales, predominantly of credit-related positions, in CIO's AFS securities portfolio. As of March 31, 2012, the value of CIO's total AFS securities portfolio exceeded its cost by approximately $8 billion. Since then, this portfolio (inclusive of the realized gains from the second quarter to date) has appreciated in value.

The Firm is currently repositioning its CIO synthetic credit portfolio, which it is doing in conjunction with its assessment of the Firm's overall credit exposure. As this repositioning is being effected in a manner designed to maximize economic value, CIO may hold certain of its current synthetic credit positions for the longer term.

(Emphasis added.)

129.    These statements were not fully truthful because they failed disclose that

the risky and illiquid nature of the trades made by CIO made impossible for certain of the

trades to be unwound in the near term. The resulting losses from the CIO trades were

also far greater than disclosed. JPMorgan only made superficial statements concerning

the nature of the credit derivatives it had been trading.

130.    The May 10, 2012 10-Q also disclosed that the period-end VaR for the

CIO had risen from $77 million as of December 31, 2011 to $186 million as of March 31,

2012 – more than double in size.

131.    After the market closed, JPMorgan held a conference call with analysts

and investors to discuss the Form 10-Q.  Dimon opened the conference call by revealing

38

that the Company had sustained a multi-billion dollar trading loss, stating, in pertinent

part, as follows:

> Operator, thank you. Good afternoon everybody. I would like to thank you all for joining us on short notice. I want to update you on a few items that we have in our just filed 10-Q. Specifically, we've given prior guidance that Corporate – that net income in the Corporate segment, remember it's not the corporation, it's just one of the segments, excl.– Private Equity and litigation, would be approximately plus or minus $200 million. This includes CIO's overall performance.
>
> We would currently estimate this number to be minus $800 million after-tax. This change is due to two items, both in CIO this quarter. I'm about to give you pretax numbers now. Slightly more than $2 billion trading loss under synthetic credit positions and $1 billion of securities gains, largely on the sale of credit exposures. I want to remind you the CIO has over $200 billion in its investment portfolio and unrealized gains as of March 30 of $8 billion.
>
> The CIO manages all the exposures in total as a whole and it does it in light of the firm's total requirements. We are also amending a disclosure in the first quarter press release about how CIOs VaR, Value at Risk. We had shown average VaR at 67.  It will now be 129. *In the first quarter, we implemented a new VaR model, which we now deemed inadequate and we went back to the old one, which had been used for the prior several years, which we deemed to be more adequate.* The numbers I just gave are effective March 30, the first quarter.
>
> Regarding what happened, the synthetic credit portfolio was a strategy to hedge the firm's overall credit exposure, which is our largest risk overall in a stressed credit environment. *We are reducing that hedge, but in hindsight the new strategy was flawed, complex, poorly reviewed, poorly executed, and poorly monitored.* The portfolio has proven to be riskier, more volatile, and less effective as an economic hedge than we thought.
>
> What have we done? We've had teams from audit, legal, risk, and various control functions, all from Corporate, involved in extensive review of what happened. *We have more work to do but it's obvious at this point that there are many errors, sloppiness, and bad judgment.*  I do remind you that none of this has anything to do with clients. We've had many lessons learned and we've already changed some policies and procedures as we've gone along. In addition, you should know that all appropriate corrective action will be taken as necessary in the future. Most important, some of our best talent from across the Company, particularly traders and risk managers, are fully engaged and helping to manage the portfolio.
>
> The portfolio still has a lot of risk and volatility going forward. So how are we going to manage that? So number one, we're going to manage it to maximize economic value for shareholders. What does that mean? It means we're going to

do something stupid. We're willing to hold as long as necessary inventory and we're willing to bear volatility. Therefore, the volatility for the rest of this quarter and next quarter or so will be high. It could cost us as much as $1 billion or more. Obviously, we're going to work hard to have that not be a negative at all, but it is risky and it will be for a couple of quarters.

Clearly, markets and our decisions will be a critical factor here. Hopefully this will not be an issue by the end of the year, but it does depend on the decisions and the markets - the decisions we make and the markets we have.

However unfortunate this event is, I do want to put this in perspective. One of the reasons we keep a fortress balance sheet is to handle surprises, although this is not the kind of surprise we wanted to have. Our Basel I ratio will stay very strong and it doesn't change at all as a result of - at March 31, a result of this. Our Basel III ratios, which remember, are a rough estimate anyway, will be amended down to 8.2 from 8.4 effective March 30. We will, however, in the future, continue to meet our very conservative targets for both Basel I and Basel III.

I also want to say, while we don't give overall earnings guidance and we're not confirming analyst estimates, if you did adjust current analyst estimates for the loss, we would still earn approximately $4 billion after-tax this quarter, give or take. Neither of these things absolves us from blame, so speaking for the senior management team and myself, while we can't assure you we won't make mistakes, we can assure you we're going to try not to.  *These were egregious mistakes. They were self-inflicted, we were accountable, and what happened violates our own standards and principles by how we want to operate the Company. This is not how we want to run a business.*

We will discuss all these matters and more and in fulsome detail on our second quarter analyst call, and we're going to take some questions on this call. I do want to tell you now we're not going to take questions about specific risk positions, strategies, or specific people.

Finally, however unfortunate this incident is, we will do what we always do. We will admit it. We will learn from it. We will fix it. We will move on. Hopefully, in the end it will make us a better company. We are in business to serve clients and nothing here detracts from all the great things that our 250,000 employees around the world do every day for our clients and communities.

So thank you for spending a little time with us today and we'll be happy to take a few minutes of questions.

(Emphasis added.)

40

132.    In the question and answer period of the May 10, 2012 Conference Call, Dimon stated that the Company tries to "keep our readers updated about what we know and when we know it and it's just a constant practice of the company."  He also acknowledged that the Company "should have acted sooner."  The Company also had been in discussions with United States and British regulators about the suspect trading but this was never disclosed by JPMorgan or mentioned by Dimon.  This fact was also not timely disclosed to investors or Plan participants.

133.    In response to the first partial disclosure of the massive trading loss, the price of JPMorgan stock declined from $40.74 per share to $36.96 per share on extremely heavy trading volume.

**E.    Dimon's Senate Committee Testimony**

134.    On June 13, 2012, Dimon testified before the U.S. Senate Banking Committee on Banking, Housing and Urban Affairs (the "Senate Committee").  He attempted to explain what had occurred, what went wrong and how JPMorgan was responding to the problems and correcting them.

135.    Dimon described the problems as limited to the CIO's synthetic credit portfolio. He explained that CIO was a unit within JPMorgan that was responsible for managing a $350 billion portfolio of the firm's excess cash in a conservative manner. The CIO's synthetic credit portfolio was supposed to protect or hedge the Company against systemic events.

136.    In December 2011, Dimon explained that, in response to new Basel capital requirements, CIO was instructed to reduce its Risk-Weighted Assets and associated risk. Instead of simply reducing its positions, Dimon testified that starting in mid-January

2012, the CIO "embarked on a complex strategy that entailed adding positions that it believed would offset existing ones", which, he testified, "ended up creating a portfolio that was larger and ultimately resulted in even more complex and hard-to-manage risks." Dimon added that "[t]his portfolio morphed into something that, rather than protect the Firm, created new and potentially larger risks."  He then stated that "we have let a lot of people down, and we are sorry for it."

> 137.   He further summed up the problems with the synthetic credit portfolio as:
>
> - CIO's strategy of reducing the synthetic credit portfolio was poorly conceived and vetted.  The strategy was not carefully analyzed or subjected to rigorous stress testing within CIO and was not reviewed outside CIO.
>
> - In hindsight, CIO's traders did not have requisite understanding of the risks they took.  When the positions began to experience losses in March and early April, they incorrectly concluded that the losses were the result of anomalous and temporary market movements, therefore were likely to reverse themselves.
>
> - The risk limits for the synthetic credit portfolio should have been specific to the portfolio and much more granular, i.e., only allowing lower limits on each specific risk being taken.
>
> - Personnel in key control roles in CIO were in transition and risk control functions were generally ineffective in challenging the judgment of CIO's trading personnel.  Risk Committee structures and processes in CIO were not formal or robust as they should have been.
>
> - CIO, particularly, the synthetic credit portfolio, should have gotten more scrutiny from both senior management and the firmwide risk control function.

> 138.   Then, Dimon described various remedial steps taken by JPMorgan, including a new CIO head, revamped risk governance, new stricter risk limits, and a new risk committee structure.  Dimon also indicated that the Company conducted an extensive review of the incident led by Mike Cavanaugh, CEO of Treasury.

139.    Dimon did not provide any detail about the magnitude of the losses, VaR model changes or any price "mismarking" by CIO traders.  These details which were known by Defendants were not disclosed when Dimon testified before the Senate Committee and did not emerge until later.

140.    In short, Dimon's testimony acknowledged that JPMorgan risk systems and controls were inadequate—the same structural problems that led to the various regulatory actions and lawsuits before the Class Period—which should have prompted the Plan fiduciaries to monitor and scrutinize the stock for prudence.

**G.  <u>JPM Announces Restatement of First Quarter Results</u>**

141.    On July 13, 2012, following the previous acknowledgement of "mistakes" and "sloppiness", and Dimon's testimony before the Senate Committee, JPMorgan announced that it was restating its financial results for the first quarter of 2012.  The Company also announced that it had determined that there was a "material weakness" in its internal controls.  The following release was issued by the Company:

> **JPMORGAN CHASE TO AMEND INTERIM FIANCIAL STATEMENT FOR THE 2012 FIRST QUARTER; NO EFFECT ON NET INCOME FOR THE SIX-MONTH PERIOD ENDED JUNE 30, 212**
>
> New York, June 13, 2012—JPMorgan & Chase & Co. (NYSE: JPM) today reported that it will restate its previously-filed interim financial statements for the first quarter of 2012.  The restatement will have no effect on total earnings or revenues for the company year-to-date.
>
> The restatement announced today will likely reduce the firm's previously-reported net income for the 2012 first quarter by $459 million.  The restatement relates to valuations of certain positions in the synthetic credit portfolio in the firm's Chief Investment Office ("CIO").
>
> More specifically, trades in CIO were expected to mark their positions where they would expect to be able to execute in the market.  *In this instance, while the positions were within thresholds established by an independent valuation control group within CIO, the firm has recently discovered information that raises*

*questions about the integrity of the trader marks and suggests that certain individuals may have been seeking to avoid showing the full amount of the losses in the portfolio during the first quarter. As a result, we are no longer confident that the trade marks reflected good faith estimates of fair value at quarter end* and we decided to remark the positions utilizing external "mid-market" benchmarks, adjusted for liquidity considerations. While there are a range of acceptable values for such positions, we believe our approach represents an objective valuation and is a reasonable approach under the circumstances.

Management reached the determination to restate June 12, 2012, and reviewed the matter with the Audit Committee of the Firm's Board of Directors on the same day.

*Our previously filed financial statements for the 2012 first quarter should no longer be relied upon.* We expect to file restated financial statements for the first quarter as soon as practical but no later than when we file our financial statements for the second quarter.

*In addition, we have determined that there was a material weakness in our internal control over financial reporting at March 31, 2012 related to CIO's internal controls over valuation of the synthetic credit portfolio.* The control deficiencies were substantially remedied by June 30, 2012.

Our internal review of thee matters is ongoing. If we obtain additional information material to our periodic financial reports, we will make appropriate disclosure.

(Emphasis added.)

142.     On July 13, 2012, JPMorgan also issued a press release of its financial

results, in which Dimon stated, in relevant part, as follows:

However, there were several significant items that affected the quarter's results – some positively; some negatively. *These included $4.4 billion of losses on CIO's synthetic credit portfolio*, $1.0 billion of securities gains in CIO and a $545 million gain on Bear Stearns-related first-loss note, for which the Firm now expects full recovery. The Firm's results also included $755 million of DVA gains, reflecting adjustments for the widening of the Firm's credit spreads which, as we have consistently said, do not reflect the underlying operations of the Firm. The Firm also reduced loan loss reserves by $2.1 billion, mostly for the mortgage and credit card portfolios. These reductions in reserves are based on the same methodologies we have used in the past – the good news is that these reductions reflected meaningful improvements in delinquencies and estimated losses in these portfolios. We continue to maintain strong reserves."

Dimon continued: "Since the end of the first quarter, we have significantly reduced the total synthetic credit risk in CIO – whether measured by notional amounts, stress testing or other statistical methods.  The reduction in risk has brought the portfolio to a scale that allowed us to transfer substantially all remaining synthetic credit positions to the Investment Bank.[1]  *The Investment Bank has the expertise, capacity, trading platforms and market franchise to effectively manage these positions and maximize economic value going forward.*  As a result of the transfer, the Investment Bank's Value-at-Risk and Risk Weighted Assets will increase, but we believe they will come down over time.  Importantly, we have put most of this problem behind us and we can now focus our full energy on what we do best – serving our clients and communities around the world."

Commenting further on CIO, Dimon said:  "*CIO will no longer trade a synthetic credit portfolio and will focus on its core mandate of conservatively investing excess deposits to earn a fair return.*  CIO's $323 billion available-for-sale portfolio had $7.9 billion of net unrealized gains at the end of the quarter.  This portfolio has an average rating of AA+, has a current yield of approximately 2.6%, and is positioned to help to protect the Firm against rapidly rising interest rates.  In addition to CIO, we have $175 billion in cash and deposits, primarily invested at central banks."

"The Firm has been conducting an extensive review of what happened in CIO and we will be sharing our observations today.  *We have already completely overhauled CIO management and enhanced the governance standards within CIO*.  We believe these events to be isolated to CIO, but have taken the opportunity to apply lessons learned across the Firm.  The Board of Directors is independently overseeing and guiding the Company's review, including any additional corrective actions.  While our review continues, it is important to note that no client was impacted."

"Treasury and CIO reported a net loss of $2.1 billion, compared with net income of $670 million in the prior year.  *Net revenue was a loss of $3.4 billion, compared with net revenue of $1.4 billion in the prior year.  The current quarter loss reflected $4.4 billion of principal transactions losses from a portfolio held by CIO, partially offset by securities gains of $1.0 billion.*  Net interest income was negative $30 million, compared with $450 million in the prior year, reflecting lower portfolio yields and the impact of higher deposit balances across the Firm."

_____

Footnote 1: For now, CIO will retain a portfolio of approximately $11 billion notional amount of mark-to-market positions as an economic hedge for certain credit exposures of the investment securities portfolio and tail risk for the portfolio.  This long protection (i.e., short credit) is simple, transparent and easy to explain and will likely be reduced over time.

143.    The acknowledgement that JPMorgan had a "material weakness" in its internal controls, coupled with the nature of the CIO's increased and uncontrolled speculative trading in departure from its purpose of risk-offsetting trades, amounts to a breach of fiduciary duty by the Company to Plan participants holding JPMorgan stock.

144.    Not only did this acknowledgement demonstrate a breach of fiduciary duty, the breach was particularly egregious as the Defendants had been observing this situation throughout the entire Class Period.  Despite that the fiduciaries of the Plan had been observing the mounting multi-billion dollar losses that were imminent to JPMorgan, such fiduciaries chose to ignore this imminent dire financial situation instead of taking action to protect the Plan from the losses that were certain to follow.

145.    Further, and even more alarming, was the fact that the losses that followed (as expected), were not losses from a single imprudent investment or an isolated bad business decision that caught Defendants by surprise.  Instead, these losses were the result of a closely monitored and carefully concealed high-risk hedging strategy—a strategy so large it became known as the London Whale—for which guaranteed multi-billion dollar losses were imminent prior to the start of the class period.  At this point, no reasonable fiduciary could disagree as to whether to divest the Plan of company stock, and thus, would not have continued to maintain the investment of company stock in the Plan as such investment was defeating and/or substantially impairing the accomplishment of the purposes of the Plan.

## H.  **JPMorgan Releases Its CIO Task Force Review**

146.    Separately, on July 13, 2012, this same day, JPMorgan also provided far more detail concerning what had occurred within CIO.   The Company issued a

presentation on the results of its CIO Task Force review ("Task Force Review") that was

filed with the SEC on Form 8-K.   This presentation purported to summarize the results

of its internal review. JPMorgan apparently retained outside counsel, reviewed emails

and documents, and interviewed numerous personnel within CIO and management.

147.    The "Summary Observations" set forth in the Task Force Review were:

- CIO judgment, execution and escalation in 1Q12 were poor.

- Level of scrutiny did not evolve commensurate with increasing
  complexity of CIO activities.

- CIO Risk Management was ineffective in dealing with Synthetic Credit
  Portfolio.

- Risk limits for CIO were not sufficiently granular.

- Approval and implementation of CIO Synthetic Credit VaR model were
  inadequate.

148.    In late 2011, the Task Force Review discussed how the CIO portfolio was

"transformed."  Firm Management had instructed CIO to reduce Risk-Weighted Assets as

part of annual budgeting process.  In response, during the first quarter of 2012,  CIO

instead "increased its net long position in investment grade indices"; "increased short

positions in some junior tranches for further default protection"; and "continued to

increase size in attempt to balance portfolio and deal with market and P&L pressures,

including perceived vulnerability to other market participants."

149.    By March 2012, the Task Force Review reported that the CIO portfolio

had become "dramatically increased size, complexity and exposure to various risks,

including:

- Exposure to relationship of Investment Grade to High Yield indices.

- Default correlation across capital structure (E.g. Super Senior v. Mezzanines).

- Basis between off-the-run indices and on-the-run indices.

150.    The Task Force Review stated that the from December 20, 2011 to March 30, 2012, CIO's gross long (notional) positions increased three times, its tranche positions increased two times and off-the-run indices increased three times.

151.    The Task Force Review acknowledges that during the first quarter of 2012, these increases in the CIO's risk levels across its portfolio occurred in violation of certain CIO-level risk limits, and that CIO-level risk limits were exceeded.

152.    In late January 2012, Firm Management approved a new Synthetic Credit VaR model and increased limits. The new Synthetic Credit VaR model was developed from August to November 2011 to prepare for implementation of Basel 2.5.  Apparently, not only did the new Synthetic Credit VaR model permit increased risk levels, there were also errors in its implementation, which exacerbated matters and further led to increased risk-taking.

153.    As early as February 2012, JPM's management was monitoring the CIO, its positions and its reduction of Risk-Weighted Assets ("RWA").  The Company accepted CIO representations that the portfolio was well-positioned that its RWA reductions were on track.  JPMorgan's management failed to detect the increased gross positions and risk levels, and VaR changes and failures.

154.    On March 23, 2012, CIO directed that no more trading occur.  Following the cessation of trading, the media reported on large losses by the CIO's London Whale and there were regular reviews and updates give to the CEO and CFO of the Company. JPM's most senior officers and the Plan fiduciaries thus were informed and briefed on the

CIO's problematic trading positions, before JPMorgan issued its earnings release for the first quarter of 2012.   In late April, Senior Corporate Risk Management began on-site bottom-up review of the CIO positions, and days later assumed control of the Synthetic Credit Portfolio.

155.    The Task Force Review observed, among other things, that "CIO-led review and analysis of Synthetic Credit Portfolio in advance of earnings release was too optimistic in hindsight."  It also observed several structural problems including that the CIO had transitions in key roles; that there was a "lack of adequate resources at CIO"; there was a lack of a robust Risk Committee structure; there were no specific risk limits for synthetic credit portfolio; and there were no limits by size, asset type or risk factor for the Synthetic Credit portfolio.

156.    Additionally, the Task Force Review discussed the material flaws in the VaR model which contributed to the CIO losses.  From August to November 2011, CIO developed a new Synthetic Credit VaR model to prepare for implementation of Basel 2.5. CIO Risk Management was not actively involved in the model's development, approval, implementation and monitoring.  There were also problems which occurred when the new VaR model was implemented.  The Task Force Review found that the correctly implemented VaR model would result in lower VaR, but errors in implementation led to even lower VaR.

157.    Thus, the undisclosed changes to the VaR models and miscues in implementing the changes resulted in false and misleading disclosures during the first quarter earnings release.

I.   **JPMorgan Releases Its CIO Task Force Review**

158.   On January 16, 2013, Defendant JPMorgan Chase & Co. released a document titled, "Report of JPMorgan Chase & Co. Management Task Force Regarding 2012 CIO Losses" ("Report"). The Report includes findings from what the authors call "a significant number of interviews of current and former JPMorgan employees, and an examination of millions of documents and tens of thousands of audio files." Plaintiffs of course have not had the opportunity to review the source materials as yet, so this section of the Complaint relies—without independent verification or analysis—on the accuracy of the Report's findings.

159.   The Report describes what it calls "lapses in oversight" and "deficiencies in risk management." Report at 1.  It recites in great detail the trading activity that ultimately resulted in massive losses (Report at 25-46) and sets out several conclusions concerning Defendants' failures. For purposes of this litigation, the relevant findings are the following: "[T]he firm did not ensure that the controls and oversight of CIO evolved commensurately with the increased complexity and risks of CIO's activities." Next, "CIO Risk Management lacked the personnel and structure necessary to manage the risks of the Synthetic Credit Portfolio." And "the risk limits applicable to CIO were not sufficiently granular. There were no limits by size, asset type or risk factor specific to the Synthetic Credit Portfolio; rather, limits in CIO were applied only to CIO as a whole. The absence of granular limits played a role in allowing the flawed trading strategies to proceed in the first quarter, especially as the positions grew in size." Report_ at 11-13.

160.   The Report concluded that "responsibility for the flaws that *allowed* the losses to occur lies primarily with CIO management but also with senior Firm

management." Report at 7 (emphasis in original). It singled out three individual Defendants as having failed in their duties, Dimon, Drew and Braunstein.

161.    With regard to Drew, the Report found that "as the Firm's Chief Investment Officer, Ina Drew failed in three critical areas with respect to the Synthetic Credit Portfolio; first, by failing to ensure that CIO management properly understood and vetted the flawed trading strategy and appropriately monitored its execution; second, by failing to ensure that the CIO control functions—including the CIO Risk and Finance organizations—were performing well and were providing effective oversight of CIO's trading strategy; and, third, by failing to appreciate the magnitude and significance of the changes in the Synthetic Credit Portfolio during the first quarter of 2012, including the increases in RWA, size, complexity and riskiness of the portfolio." Report_ at 7-8.

162.    With regard to Braunstein, the Report concluded that "[a]s the Firms' Chief Financial Officer, Douglas Braunstein bears responsibility, in the Task Force's view, for weaknesses in financial controls applicable to the Synthetic Credit Portfolio, as well as for the CIO Finance organization's failure to have asked more questions or to have sought additional information about the evolution of the portfolio during the first quarter of 2012. This includes the failure by CIO Finance to have sufficiently questioned the size of the positions, the increase in RWA notwithstanding the RWA reduction mandate and the Synthetic Credit Portfolio's profit-and-loss performance. And while the Task Force believes that the principal control missteps here were risk-related, the CIO Finance organization could have done more." Report_ at 8-9.

163.    And with regard to Dimon, the Task Force agreed with Dimon's statement that "[t]hese were egregious mistakes. They were self-inflicted, we were accountable and

what happened violates our own standards and principles by how we want to operate the company. This is not how we want to run a business." It found that "more should have been done regarding the risks, risk controls and personnel associated with CIO's activities, and Mr. Dimon bears some responsibility for that." Report at_ at 9-10.

164.    Regarding CIO's trades themselves, the Task Force observed that the "trading strategies that were put in place in early 2012 were poorly conceived and vetted, and neither the trading nor its impact on RWA were fully understood by CIO management or the traders." Report at_ at 85.

165.    Expanding on the troubling conclusions noted at the outset of the Report, the Task Force explains that "the Firm did not ensure that the controls and oversight of CIO evolved  commensurately with the increased complexity and risks of CIO's activities. As a result, result, there existed significant risk management weaknesses within CIO that played a key role in allowing the flawed, risky trading strategies to be pursued." Report at 93-94.

166.    The Report continues, "For a significant period of time prior to the first quarter of 2012, CIO was subjected to less rigorous scrutiny than client-facing lines of business. The lower level of oversight engendered weak risk management and infrastructure within CIO, which performed ineffectively at a time when robust, effective controls were most needed." Report at 94. It explains that "[g]ranular limits were lacking, and risk managers did not feel adequately empowered. These matters became even more critical once the Synthetic Credit Portfolio grew in size, complexity and risk profile during the first quarter of 2012. Further, by the time the Firm's new Chief Risk Officer was appointed in January 2012 and launched an effort to compare and improve practices

throughout the Firm, it was too late to build the risk controls and develop the structure that may have helped to prevent the losses in CIO." Report at 94.

167. The Report found that "[t]here was no meaningful effort to ensure that, notwithstanding this fact, CIO was subject to appropriately rigorous risk and other limits and was updating those limits on a regular basis." Report at 95.

168. The Report also found that "the CIO Risk organization did not mature into the type of robust and independent function that is needed for trading activities that involve significant risk. The CIO Risk function was not staffed with as many experienced or strong personnel as it should have been. The Firmwide Risk organization bears responsibility for not having built, over time, a strong, independent Risk function within CIO." Report at 96. And it adds that "CIO management also bears responsibility for this weakness in the CIO Risk function." Report at 96.

169. Next, the Report found that "CIO Risk Management lacked the personnel and structure necessary to properly risk-manage the Synthetic Credit Portfolio, and as a result, it failed to serve as a meaningful check on the activities of the CIO management and traders. This occurred through failures of risk managers (and others) both within and outside of CIO." Report at 97.

170. The Task Force also reports that there were significant personnel issues, including a lack of empowerment of those responsible for policing risk within CIO. For example, it found that "with respect to some Risk managers…there was a sense that they were accountable first and foremost to CIO managers rather than to the Firm's global Risk organization. They generally did not feel empowered to take the kinds of actions that risk managers elsewhere within the Firm believed that they could and should take.

Responsibility for this failure lies not only with CIO Risk managers, but with Ms. Drew as well. Report at 100.

171.    Finally, the Task Force "concluded that the losses were the result of a number of acts and omissions, some large and some seemingly small, some involving personnel and some involving structure, and a change in any one of which might have led to a different result." Report at 119-120.

172.    Taken together, the findings and conclusions of the Task Force present a picture of lax risk tolerance, faulty oversight, a lack of urgency on resolving personnel shortcomings that could have prevented the London Whale debacle. Named both collectively and individually in the Report, Defendants cannot escape accountability for their failings and misconduct.

### J.   **The CIO Conspiracy To Hide Losses**

173.    The Task Force Review and the Report also reported its finding that CIO traders mis-marked their positions at end of the first quarter of 2012.   CIO traders at JPMorgan were supposed to value or mark its CIO trading positions where they would expect to be able to execute in the market.

174.    During the review, JPMorgan's management concluded that it had identified "concerns around the integrity of the trader's marks".  From the review of emails, voice tapes and other documents supplemented by interview, the Task Force found evidence that CIO traders falsified valuations by intentionally marking at prices at which they had no good faith belief that they could execute a trade.  Traders were seeking to avoid showing the full amount of losses on CIO positions.

175.    As a result of these findings, JPMorgan concluded that there was a material weakness in the CIO valuation controls during first quarter of 2012 and JPMorgan announced it would restate its financial reports for the first quarter.  JPMorgan also took other remedial actions to restructure the CIO group and adopt new risk controls.

176.    The Task Force Review also stated that "[t]o date, all CIO managers based in London with responsibility for Synthetic Credit Portfolio have been separated from the Firm," without payment of any severance or 2012 incentive compensation.  JPMorgan also decided to "claw back" annual compensation and restricted stock and stock option compensation from the individuals.

177.    According to media reports, Boris Iksil, the London Whale, was one of the CIO traders who falsely marked CIO trades, and was terminated in July 2012.   His two supervisors, Javier Martin-Artajo and Achilles Macris, were also terminated for mismarking positions as part of the conspiracy to hide losses.  In addition, Julien Grout, a trader who worked in CIO and reported to Iksil has also been indentified as possibly being involved in the conspiracy to mismark positions.

178.    Ina Drew, former head of CIO, resigned in May 2012, and Irvin Goldman, the former Chief Risk Officer for CIO, resigned in July 2012.

179.    This conspiracy to hide losses through mismarking CIO positions contributed to JPMorgan's misstatements for the first quarter of 2012.   The Officer Defendants had duties to ensure that JPMorgan had sufficient controls and procedures to detect and prevent this type of conspiracy, yet the firm managers who were regularly reviewing CIO trades and losses were reckless in failing to detect the false marks.

180.    In sum, the revelations which resulted from the Task Force's Review and JPMorgan's restatements for the first quarter of 2012, demonstrate that the Company engaged in self-dealing activity that violated fiduciary duties under ERISA, and misled Plan participants and the public with false and misleading statements.

**K.  JPMorgan's Stock Price**

181.    On July 12, 2012, JPMorgan stock closed at $34.04, down from its peak at or about $45 per share.

182.    During the Class Period, JPMorgan common stock traded, as a result of the materially false and misleading statements and failures to disclose discussed above, at artificially inflated prices.  The market for JPMorgan common stock was open, well-developed and efficient at all relevant times. Plaintiff and other members of the Class who purchased or otherwise acquired JPMorgan common stock through the Plans were relying upon the integrity of the market price of JPMorgan common stock and market information relating to JPMorgan, and have been damaged thereby.

183.    As a result of their investments in JPMorgan common stock during the Class Period, Plaintiff and the other Class members suffered substantial economic loss, i.e. damages, to their retirement savings.

**L.  Defendants Knew or Should Have Known That JPMorgan Stock Was Imprudent Yet Misled Plan Participants**

184.    During the Class Period, Defendants knew or should have known that the Company's stock was an imprudent Plan investment due to: (a) speculative past uncontrolled CIO trading, and the sudden increase in massive risk-taking before the Class Period; (b) the VaR changes which hid true risks associated with CIO speculative trades; (c) CIO's violations of risk limits; (d) the attempts to falsify CIO trade marks; (e) the now

56

admitted "material weakness" in the Company's internal controls; (f)  prior regulatory actions and lawsuits against JPMorgan; (g) the fact that as a result of these that JPMorgan's stock price was artificially inflated; and (h) the fact that heavy concentration of retirement savings in the Company's stock would inevitably result in significant losses to the Plan, and consequently, to its participants.  Despite actual or constructive knowledge of these facts, Defendants did nothing to protect the heavy investment of the Plan participants' retirement savings into JPMorgan stock.

185.    Through their high ranking positions with the Company, Defendants knew or should have known of the existence of these problems, and the fact that they would jeopardize and imperil JPMorgan and its financial condition.

186.    Defendants knew or should have known that, due to the CIO trades, JPMorgan's stock price would suffer and devastate the Plan participants' retirement savings when the truth became known. Yet Defendants failed to take any steps to protect the Plan and its participants from foreseeable losses.

187.    Defendants also knew or should have known that, due to the false and misleading statements and omissions, Plan participants were unable to properly assess the prudence of investing in JPMorgan stock.

188.    Defendants failed to conduct an appropriate evaluation or investigation of whether JPMorgan stock was a prudent investment for the Plan and, in connection therewith, failed to provide Plan participants with information regarding its internal problems and weaknesses so that they could make informed decisions.

189.    In addition, Defendants failed to adequately review the performance of other Plan fiduciaries to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

190.    An adequate investigation would have revealed to a reasonable fiduciary that investment by the Plan in JPMorgan stock was imprudent during the Class Period.  A prudent fiduciary acting under similar circumstances would have acted to prevent participants against unnecessary losses, and would have made different investment decisions.

191.    Because Defendants knew that JPMorgan stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and their participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in JPMorgan stock.

192.    Defendants had available to them many options for satisfying this duty, including among other things: discontinuing further contributions or investments in JPMorgan stock under the Plan either temporarily or until further review; divesting the Plan of JPMorgan stock; providing written warnings to Plan participants; consulting with independent fiduciaries regarding appropriate measures; and/or resigning as fiduciaries.

193.    Despite the availability of these and other options, Defendants failed to take any action to protect Plan participants from losses resulting from the Plan's investment in JPMorgan stock.  In fact, Defendants continued to invest and allow the Plan's investment in Company stock even as the problems came to light.

194.    Defendants' breaches of their ERISA-mandated fiduciary duties of prudence and loyalty were, by their nature, self-concealing and could not be discovered

by the Plan participants.  Further, Defendants alleged breaches, including breaches of duties to speak truthfully and provide material information to Plan participants regarding the propriety of JPMorgan stock, served to conceal Defendants' primary breach of their duty of prudence.  Defendants' misleading, inaccurate and incomplete statements regarding the CIO trades and risks, served to hide from Plan participants: i) the factual predicate for the breach of fiduciary duty above and reasons alleged herein why JPMorgan stock had become imprudent; and ii) the failure/absence of any investigation into the prudence of investing Plan assets into JPMorgan stock.

### M.   Shareholders Ask JPMorgan to Consider a Break-Up

195.    In the wake of public revelations concerning the risk management and internal controls failures that allowed the London Whale trading loss to occur, some prominent JPMorgan shareholders have taken steps to protect themselves from further disasters, asking the bank to consider breaking itself up

196.    On December 3, 2012, the Office of Investment of one of the nation's largest public unions, the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"), wrote to JPMorgan requesting that it include a proposal in its annual meeting proxy statement. The proposal calls on the company to appoint a committee of independent directors "to explore extraordinary transactions that could enhance stockholder value, including but not limited to…the separation of one or more of JPMorgan's businesses." The proposed committee would public report its analysis no more than 120 days after the 2013 annual shareholder meeting.

197.    The AFL-CIO explained its rationale for the proposal: "In 2012, weaknesses in JPMorgan's internal controls and risk management came to light when

[the] company announced a multi-billion dollar trading loss by a trader who has been infamously nicknamed the 'London Whale.' JPMorgan initially estimated the loss to be $2 billion, but is has subsequently revised its estimate with news reports stating that the losses may reach $9 billion…. In our view, JPMorgan's difficulty determining the extent of its trading losses suggests that the firm may be too big to manage."

198.    It continued: "While there may be economies of scale in banking, we believe that a point can be reached where operational complexities make it impossible for even the most talented managers to provide effective oversight. In our view, the evidence is mounting that JPMorgan has reached the point where stockholders would benefit from restructuring."

199.    On January 14, 2013, counsel for JPMorgan wrote to the SEC requesting assurance that the agency would not recommend an enforcement action against the company if it omitted the AFL-CIO's proposal from its proxy.

200.    The AFL-CIO's concerns reflect those of countless JPMorgan shareholders who have stood by and watched as billions in losses have accumulated as a result of the company's shoddy risk management and internal controls, causing a sharp decline in shareholder value and making plain that any stock acquired during the Class Period was artificially inflated.

.

## V.    CLASS ACTION ALLEGATIONS

201.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All individuals, excluding Defendants, who participated in the Plan and whose individual accounts transacted in and/or held JPMorgan common stock at any time between December 20, 2011, through July 12, 2012.

202.    Excluded from the Class are Defendants, the officers and directors of the Company and any employees working in the CIO unit at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

203.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are over 200,000 members in the proposed Class because, according to JPMorgan's Form 5500, there were 271,145 Class members as of December 31, 2011.  Record owners and other members of the Class may be identified from records maintained by JPMorgan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

204.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

205.    Plaintiffs will fairly and adequately protect the interests of the members of

the Class and have retained counsel competent and experienced in class action and

securities litigation.

206.    Common questions of law and fact exist as to all members of the Class

and predominate over any questions solely affecting individual members of the Class.

Among the questions of law and fact common to the Class are:

    a.    Whether Defendants each owed a fiduciary duty to the Plans, Plaintiffs
    and members of the Class;

    b.    Whether Defendants breached fiduciary duties owed to the Plans,
    Plaintiffs and members of the Class by failing to act prudently and loyally and
    solely in the interests of the Plans and the Plan's participants and beneficiaries;

    c.    Whether Defendants failed to provide sufficient material disclosure
    required under ERISA to the Plan participants;

    d.    Whether the Defendants violated ERISA; and

    e.    To what extent the members of the Class have sustained damages and the
    proper measure of damages.

207.    Plaintiffs' claims are typical of the claims of the members of the Class

because Plaintiffs and the other members of the Class each sustained damages and/or

were negatively affected by Defendants' wrongful conduct in violation of ERISA as

complained of herein.

208.    Plaintiffs will fairly and adequately protect the interests of the members of

the Class and have retained counsel highly competent and experienced in class action and

complex litigation, including actions involving ERISA employee pension plans. Plaintiffs

have no interests antagonistic to or in conflict with those of the Class.

209.    Class action status in this ERISA action is warranted under Rule

23(b)(1)(B) because this action is brought on behalf of the Plan and any prosecution of

separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impeded their ability to protect their interests.

210.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standard of conduct for Defendants and/or the Nominal Defendant (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

## VI.    FIDUCIARY DUTIES UNDER ERISA

**The Statutory Requirements:**

211.    ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

**The Duty of Loyalty:**

212.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A),  imposes on a plan fiduciary the duty of loyalty—that is, the duty to "discharge his duties with respect to a

63

plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of … providing benefits to participants and their beneficiaries....”

213.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

**The Duty of Prudence:**

214.    ERISA § 404(a)(l)(B), 29 U.S.C. § 1104(a)(1)(B),  also imposes on a plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims .... "

**The Duty to Inform:**

215.    The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

216.    Pursuant to the duty to inform, fiduciaries of the Plans were required under ERISA to furnish certain information to Participants. For example, ERISA § 101,

29 U.S.C. § 1021, requires that fiduciaries furnish a Summary Plan Description ("SPD")

to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise

Participants of their rights under the Plan. The SPD and all information contained or

incorporated therein constitutes a representation in a fiduciary capacity upon which

Participants were entitled to rely in determining the identity and responsibilities of

fiduciaries under the Plans and in making decisions concerning their benefits and

investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted. 29 C.F.R. § 2520.102-2(b).

**The Duty to Investigate and Monitor Investment Alternatives:**

217.    With respect to a pension plan such as the Plans, the duties of loyalty and

prudence also entail a duty to conduct an independent investigation into, and continually

to monitor, the merits of the investment alternatives in the Plans, including employer

securities, to ensure that each investment is a suitable option for the Plans.

**The Duty to Monitor Appointed Fiduciaries:**

218.    Fiduciaries responsible for appointing other fiduciaries have the further

duty to monitor the fiduciaries thus appointed. The duty to monitor entails both giving

information to and reviewing the actions of the appointed fiduciaries. In the Plans, the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a) possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

(b) are knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of Plans' Participants;

(c) are provided with adequate financial resources to do their jobs;

(d) have adequate information to do their jobs of overseeing the Plans' investments with respect to company stock;

(e) have access to outside, impartial advisors when needed;

(f) maintain adequate records of the information on which they base their decisions and analysis with respect to Plans' investment options; and

(g) report regularly to the monitoring fiduciaries. The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

219.    On information and belief, Defendants lacked a reasonable system with which to monitor the fiduciaries appointed to ensure that the Plan was administered appropriately and prudently.

**The Duty Sometimes to Disregard Plan Documents:**

220.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

**Co-Fiduciary Liability:**

221.    A fiduciary is liable not only for fiduciary breaches within the sphere of

his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA §

405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>> (1) if he participates knowingly in, or knowingly undertakes to
>> conceal, an act or omission of such other fiduciary, knowing such act or
>> omission is a breach; or
>> (2) if, by his failure to comply with section 404(a)(l) in the administration
>> of his specific responsibilities which give rise to his status as a fiduciary,
>> he has enabled such other fiduciary to commit a breach; or
>> (3) if he has knowledge of a breach by such other fiduciary, unless he
>> makes reasonable efforts under the circumstances to remedy the breach.

**Non-Fiduciary Liability:**

222.    Under ERISA non-fiduciaries who knowingly participate in a fiduciary

breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. §

1132(a)(3).

**JPMorgan's Fiduciary Status**

223.    Instead of delegating fiduciary responsibility for the Plans to external

service providers, the Company chose to internalize certain vital aspects of this fiduciary

function.

224.    During the Class Period, JPMorgan was also a fiduciary of the Plans

within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because, JPMorgan through

its officers, directors or otherwise, exercised discretionary authority with respect to

management and administration of the Plan and/or management and disposition of the

Plans' assets, and is therefore a fiduciary of the Plans. JPMorgan also exercised

discretionary authority with respect to the appointment, removal, and, thus, monitoring of other fiduciaries of the Plans that it appointed, or to whom it assigned fiduciary responsibility.

225.    By failing to properly discharge their fiduciary duties under ERISA, the employee and officer defendants, including the Committee Defendants, breached fiduciary duties they owed to the Plans, their participants and their beneficiaries. Such individuals were appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment. Accordingly, the actions of such employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

226.    In addition, JPMorgan acted as a fiduciary in connection with the dissemination of communications to the Plan's Participants. JPMorgan made direct representations to Participants relating specifically to the business and financial condition of JPMorgan, and the merits of investing the Plan's assets In JPMorgan common stock, and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan. Further, many of these representations and communications were false, or lacked any reasonable basis, given the looming multi-billion dollar liability that was imminently approaching.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

227.    ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plans and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly

allow others to materially mislead, plan participants and beneficiaries. "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe,* 516 U.S. 489, 506 (1996); *see also In re Unisys Corp. Retiree Medical Benefit ERISA Litig.,* 57 F.3d 1255, 1261 (3d Cir. 1995); *Fisher v. Philadelphia Elec. Co.,* 994 F.2d 130, 133 (3d Cir. 1993).

228.    Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured. *See*, *e.g.*, *In re Unisys Corp.*, 994 F.2d at 133 ("a plan administrator has an affirmative duty to speak when it knows that silence might be harmful"); *see also Bixler v. Central Penn. Teamsters Health* & *Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002); *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004).

229.    During the Class Period, upon information and belief, the Company and certain other Defendants made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including SPDs and/or prospectuses regarding Plans/participant holdings of Company stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, JPMorgan's SEC filings were incorporated into and part of the SPD, and/or a prospectus and/or any applicable SEC Form S-8 registration statements. Defendants also acted as fiduciaries to the extent of this activity.

**All of the Defendants Were Co-Fiduciaries**

230.    Each defendant is liable for the breaches of fiduciary duty of the other

defendants under ERISA § 405, 29 U.S.C. § 1105.

## VII.    CLAIMS FOR RELIEF UNDER ERISA

231.    At all relevant times, Defendants were and acted as fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

232.    ERISA § 502(a)(2), 29 U.S.C. § 1 132(a)(2), provides, in pertinent part,

that a civil action may be brought by a participant for relief under ERISA § 409, 29

U.S.C. § 1109.

233.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary

Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a

plan who breaches any of the responsibilities, obligations, or duties imposed upon

fiduciaries by this title shall be personally liable to make good to such plan any losses to

the plan resulting from each such breach, and to restore to such plan any profits of such

fiduciary which have been made through use of assets of the plan by the fiduciary, and

shall be subject to such other equitable or remedial relief as the court may deem

appropriate, including removal of such fiduciary.

234.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B),

provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan

solely in the interest of the participants and beneficiaries, for the exclusive purpose of

providing benefits to participants and their beneficiaries, and with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims.

235.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to

as the duties of loyalty, exclusive purpose and prudence and are the "highest known to

the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8 (2d Cir. 1982).  They entail,

among other things:

    a.  The duty to conduct an independent and thorough investigation into, and
        continually to monitor, the merits of all the investment alternatives of a plan;

    b.  A duty to avoid conflicts of interest and to resolve them promptly when they
        occur. A fiduciary must always administer a plan with an "eye single" to the
        interests of the participants and beneficiaries, regardless of the interests of the
        fiduciaries themselves or the plan sponsor; and

    c.  A duty to disclose and inform, which encompasses: (1) a negative duty not to
        misinform; (2) an affirmative duty to inform when the fiduciary knows or
        should know that silence might be harmful; and (3) a duty to convey complete
        and accurate information material to the circumstances of participants and
        beneficiaries.

236.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-

fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances: (A) if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing such act or omission
> is a breach; (B) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1
> 104(a)(1), in the administration of his specific responsibilities which give rise to
> his status as a fiduciary, he has enabled such other fiduciary to commit a breach;
> or (C) if he has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

237.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)

for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising

out of the breaches of fiduciary duties by the Defendants for violations under ERISA §

404(a)(l) and ERISA § 405(a).

**COUNT I**
**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

238.    Plaintiffs incorporate the allegations contained in the previous paragraphs
of this Complaint as if fully set forth herein.

239.    At all relevant times, as alleged above, all Defendants were fiduciaries
within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised
discretionary authority or control over the administration and/or management of the Plan
or disposition of the Plan's assets.

240.    Under ERISA, fiduciaries who exercise discretionary authority or control
over management of a plan or disposition of a plan's assets are responsible for ensuring
that investment options made available to participants under a plan are prudent.
Furthermore, such fiduciaries are responsible for ensuring that all investments in the
Company's stock in the Plan were prudent and that such investment was consistent with
the purpose of the Plan.  Defendants are liable for losses incurred as a result of such
investments being imprudent.

241.    A fiduciary's duty of loyalty and prudence requires it to disregard plan
documents or directives that it knows or reasonably should have known would lead to an
imprudent result or would otherwise harm plan participants or beneficiaries. ERISA §
404(a)(l)(D), 29 U.S.C. § 11 04(a)(l)(D). Thus, a fiduciary may not blindly follow plan
documents or directives that would lead to an imprudent result or that would harm plan

participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

242.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

243.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, Defendants knew or should have known that, throughout the Class Period, JPMorgan stock had become imprudent investment for Plan participants' retirement savings.  Accordingly, Defendants should have taken appropriate responsive action of restricting transactions or new investments by the Plan in JPM stock and/or divesting Plan assets from JPMorgan stock.

244.    Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and/or the Company's concealment of the same.  As such, Plan participants could not appreciate the true risks presented by investments in the Company's stock and therefore, could not make informed decisions regarding their investments.

245.    Defendants also had actual or constructive knowledge that the Plan's participants did not have full and complete information about the Company, and thus were unable to make fully informed decisions about whether to retain their holdings in Company stock.  As such, Defendants had the fiduciary obligation to either inform the Plan's participants of the need to take action to protect their financial interests or, if necessary, to liquidate holdings of Company stock on participants' behalf to ensure that they did not suffer a financial loss.

246.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's participants suffered damage to and/or lost a significant portion of their retirement investments. Had Defendants taken the appropriate steps to comply with their fiduciary obligations, the Plan participants would have avoided foreseeable losses from transactions in JPM stock and/or liquidated some or all of their holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plan.

247.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT II
**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by JPMorgan and the Committee Defendants)**

248.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

249.    At all relevant times, as alleged above, JPMorgan and the Committee Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

250.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of JPMorgan and the Committee Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Committee and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

251.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, JPMorgan, and the Committee Defendants, had the duty to:

    a.  Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

    b.  Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

    c.  Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

    d.  Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

    e.  Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investments; and

    f.  Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries. The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

252.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

253.    JPMorgan and the Committee Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the Committee Defendants completely appreciated the huge risk of significant investment of the Plan's retirement savings of employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation; (b) failing to disclose to the Committee Defendants accurate information about the operations and CIO trades of JPMorgan which Defendants reasonably should have known the Committee Defendants needed to make sufficiently informed decisions about construing, interpreting, and administering the Plans; (c) failing to ensure that the members of the Committee Defendants were prudently and loyally managing and administering the Plans; and (d) to the extent it was necessary, failing to remove and replace members of the Committee Defendants for their failure to prudently and loyally manage and administer the Plan. JPMorgan and the Committee Defendants knew or should have known that the fiduciaries they were responsible for monitoring were continuing to invest the assets of the Plan in JPMorgan common stock when it no longer was prudent to do so.  Despite this knowledge, JPMorgan and the Committee Defendants failed to take action to protect the

Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

254.     In addition, JPMorgan and the Committee Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of JPMorgan that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

255.     JPMorgan and the Committee Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

256.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's participants suffered damage to and/or lost a significant portion of their retirement investments.

257.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

### COUNT III
### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)

258.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

259.    At all relevant times, as alleged above, Defendants were fiduciaries within the Plans within meaning of ERISA § 3(21)(A), 29 U.S.C. § l002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

260.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on Plans fiduciaries a duty of loyalty, that is, a duty to discharge his duties with respect to a Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

261.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia:*

   a.   Failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities;

   b.   Failing to take such other steps as were necessary to ensure that the interests of Plaintiffs and members of the Class were loyally and prudently served;

   c.   By otherwise placing the interests of JPMorgan and themselves above the interests of the Participants with respect to the Plan's investment in JPMorgan Stock, by among other things, keeping the Plan's assets heavily invested in JPMorgan common stock when Defendants had knowledge it was imprudent to do so – rather than divesting the Plan's investments in JPMorgan common stock – while certain fiduciaries sold their personally held JPMorgan common stock at artificially inflated prices. As a result, certain fiduciaries personally profited from those sales while the Plan and its Participants suffered massive losses.

262.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered substantial losses. If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of

fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's participants, suffered substantial damages to or lost a significant portion of its retirement investments.

263.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV
### Co-Fiduciary Liability
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against the Committee and Officer Defendants)

264.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

265.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

266.    As alleged herein, Defendants failed to provide material information to the Plan participants and provided misleading disclosures by the conduct set forth above and, thus, knowledge of such practices is imputed to these Defendants as a matter of law.  In

addition, Defendants had knowledge at all relevant times of the factual matters pertaining to the imprudence of JPMorgan stock as an investment for the Plan participants' retirement assets.

267.    Despite this knowledge, the Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's transactions and investments in JPMorgan stock during the Class Period.  Defendants did so by themselves making imprudent and disloyal decisions regarding the Plan's investment in JPMorgan stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A). In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one another's failures to prudently and loyally manage the Plan's investment in JPMorgan stock, despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405 (a)(l)(C).

268.    In further violation of ERISA § 405(a)(1)(C), the Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Plan participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole. Instead, they compounded the problem by further concealing JPMorgan's improper practices from Plan participants and the market as a whole.

269.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's participants, suffered substantial damages to and/or lost a significant portion of their retirement investment.

270.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiffs as class representatives, and determining that Plaintiffs' counsel satisfies the prerequisites of Rule 23(g);

B.    A Declaration that Defendants breached ERISA fiduciary duties owed to the Plans and Participants;

C.    A Declaration that Defendants are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.    An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

E.    Imposition a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.      An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

H.      An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in JPMorgan common stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of JPMorgan common stock;

I.      Awarding the Plan and/or Participants rescission and/or money damages (including pre-judgment interest) pursuant to the Securities Act;

J.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

K.      An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

M.      Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: New York, NY
        February 14, 2013

ZAMANSKY & ASSOCIATES LLC

By: _____

Jacob H. Zamansky (JZ 1999)
Edward H. Glenn, Jr. (EG 0042)
Kevin D. Galbraith (KG 7512)
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*jake@zamansky.com*

*Counsel for Plaintiffs and Interim Lead*
*Counsel for the Class*

Brian C. Kerr
(kerr@browerpiven.com)
BROWER PIVEN
A Professional Corporation
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone:  (212) 501-9000
Facsimile:  (212) 501-0300

Kenneth G. Gilman
(kgilman@gilmanpastor.com)
Thomas E. N. Shea
(tshea@gilmanpastor.com)
GILMAN LAW LLP
Beachway Professional Center Tower
3301 Bonita Beach Road, Suite 307
Bonita Springs, Florida 34134
Telephone:  (239) 221-8301
Facsimile:  (239) 676-8224

*Additional Counsel*
*for Plaintiffs and the Class*

83